Mark I. Labaton (Bar No. 159555)
mlabaton@motleyrice.com
Robert Zabb (Bar No. 114405)
rzabb@motleyrice.com
MOTLEY RICE LLP
1801 Century Park East, #475
Los Angeles, CA 90067
Telephone: (310) 552-7992
Facsimile: (310) 552-8054

Joel H. Bernstein
jbernstein@labaton.com
Martis Alex (Bar No. 77903)
malex@labaton.com
Mark S. Arisohn
marisohn@labaton.com
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

Attorneys for Plaintiffs ASSET
MANAGEMENT FUND, d/b/a AMF
FUNDS, AMF INTERMEDIATE
MORTGAGE FUND, AMF ULTRA
SHORT FUND, AMF ULTRA SHORT
MORTGAGE FUND, AMF SHORT U.S.
GOVERNMENT FUND, and AMF U.S.
GOVERNMENT MORTGAGE FUND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORP. MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 11-ML-02265-MRP (MANx)<br>**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br>Date: December 18, 2012<br>Time: 11:00 a.m.<br>Courtroom: 12<br>Judge: Hon. Mariana R. Pfaelzer |
| ASSET MANAGEMENT FUND, D/B/A AMF FUNDS, *et al.*,<br>                    Plaintiffs,<br>v.<br>BANK OF AMERICA CORPORATION, *et al.*,<br>                    Defendants. | Case No. 12-CV-04775-MRP (MANx) |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iv

PRELIMINARY STATEMENT .......................................................................... 1

ARGUMENT ....................................................................................................... 3

I.  AMF's CLAIMS ARE TIMELY UNDER THE APPLICABLE STATUTE OF LIMITATIONS ............................................................. 3

    A.  Illinois Law Applies to Plaintiffs' Claims under the New York Borrowing Statute ............................................................. 3

    B.  Plaintiffs' Claims Are Timely Under Illinois Law ............................... 5

        1.  Plaintiffs' Time to Bring Their Claims Was Tolled Due to the Defendants' Fraudulent Concealment ................................... 5

        2.  The Illinois Three-Year Statute of Limitations Does Not Bar Plaintiffs' Claims ...................................................... 7

II.  THE COMPLAINT ADEQUATELY PLEADS NUMEROUS MISREPRESENTATIONS ........................................................................ 8

    A.  Occupancy Misrepresentations State a Claim for Fraud ...................... 8

    B.  Plaintiffs Have Adequately Alleged Misrepresentations Regarding LTV/CLTV Ratios ............................................................. 9

        1.  Defendants' "Margin of Error" Argument is Specious ........... 10

        2.  Plaintiffs' Allegations Establish Falsity Even if Sale Prices Were Sometimes Used for LTV Ratios ........................ 12

        3.  Defendants Knew the Appraisals Were False .......................... 12

        4.  Risk Disclosures Do Not Relate to Defendants' Fraud ........... 14

        5.  Cure and Repurchase Is not the Proper Remedy .................... 15

    C.  Plaintiffs Have Adequately Alleged Widespread Failures to Comply with Underwriting Guidelines and Defendants' Knowledge of Such Failures ........................................................ 17

    D.  The Complaint Adequately Pleads Fraud and Related Claims Based On the Misrepresentations that the Securities Were "Mortgage-Backed" ............................................................. 21

        1.  Transfers of Mortgage Loans Require Indorsement and Delivery of Notes to the Transferee ....................................... 21

        2.  The Offering Documents Affirmatively Represented that the Certificates Would be Mortgage-Backed Securities and that the Trusts Would Qualify as REMICS ........................ 23

3. The Complaint Alleges Sworn Court Documents Found by Plaintiffs that Confirm that the Mortgage Loans Were Not Transferred to the Trusts at Closing .................................. 26

4. Defendants' Attempts to Circumvent the Sworn Documents Found by Plaintiffs Are Unavailing .................... 26

   (a) The Complaint Alleges Affirmative Representations that the Certificates Would be Mortgage-Backed, Not Just Descriptions of the Provisions of the PSAs .................................................. 27

   (b) The Trusts' Collections of Loan Payments and Foreclosures on Defaulted Mortgages Do Not Prove that the Mortgage Loans Were Properly Transferred .................................................................. 28

   (c) The PSAs Did Not, and Could Not, Effect the Loan Transfers by Themselves .................................. 30

   (d) The Complaint Does Not Allege Mere Failures to Perform Future Contractual Obligations ..................... 32

   (e) The PSAs' "Put-Back" Provision Is Not Plaintiffs' Sole Remedy .................................................. 33

III. PLAINTIFFS PLEAD RELIANCE WITH SUFFICIENT PARTICULARITY ................................................................... 34

   A. The Complaint Adequately Pleads Actual Reliance ......................... 34

   B. Defendants' Various Arguments as to Reliance Fail ......................... 36

     1. Defendants' "Disclosures" Do Not Defeat Reliance .............. 36

     2. The Complaint's Reliance Allegations Are Sufficiently Particular ...................................................................... 38

     3. Plaintiffs Relied on All of the Offering Materials, Not Just the Prospectus Supplements ..................................... 38

     4. Whether Reliance on the Offering Materials Years After Issuance Is Reasonable Is A Fact Issue That Cannot Be Resolved on a Motion to Dismiss ............................... 42

IV. THE COMPLAINT ADEQUATELY ALLEGES SCIENTER FOR THE LOAN QUALITY CLAIMS ................................................. 42

V. THE COMPLAINT ADEQUATELY PLEADS SCIENTER FOR THE MISREPRESENTATION THAT THE SECURITIES WERE MORTGAGE-BACKED ........................................................... 45

VI. THE COMPLAINT SUFFICIENTLY PLEADS LOSS CAUSATION ...... 46

VII. THE COMPLAINT SUFFICIENTLY PLEADS INJURY ................... 47

VIII.  THE COMPLAINT STATES A CAUSE OF ACTION FOR AIDING
       AND ABETTING FRAUD.........................................................................49

IX.    THE NEGLIGENT MISREPRESENTATION CLAIMS SHOULD
       NOT BE DISMISSED...............................................................................51

X.     PLAINTIFFS HAVE ADEQUATELY PLED A *DE FACTO*
       MERGER UNDER DELAWARE LAW ....................................................54

CONCLUSION..........................................................................................................56

## TABLE OF AUTHORITIES

### Cases

*5-Star Management, Inc. v. Rogers*,
  940 F. Supp. 512 (E.D.N.Y. 1996)..................................................... 21

*Abu Dabi Commercial Bank
  v. Morgan Stanley & Co.*,
  No. 08 Civ. 7508 (SAS), ECF No. 474
  (S.D.N.Y. Aug. 17, 2012)..................................................... 40

*Abu Dhabi Commercial Bank
  v. Morgan Stanley & Co.*,
  No. 08 Civ. 7508 (SAS), 2012 WL 4762039
  (S.D.N.Y. October 5, 2012)..................................................... 52

*ACA Financial Guaranty Corp.
  v. Goldman Sachs & Co.*,
  35 Misc. 3d 1217 (A)
  (N.Y. Sup. Ct. New York Cnty. 2012) .............................................. 47

*In re Adler, Coleman Clearing Corp.*,
  247 B.R. 51 (Bankr. S.D.N.Y. 1999),
  *aff'd*, 263 B.R. 406 (Bankr. S.D.N.Y. 2001)..................................... 40

*Allstate Insurance Co.
  v. Countrywide Financial Corp.*,
  824 F. Supp. 2d 1164 (C.D. Cal. 2011)..................................... *passim*

*Allstate Insurance Co.
  v. Countrywide Financial Corp.*,
  842 F. Supp. 2d 1216 (C.D. Cal. 2012)............................................. 54

*In re Bear Stearns Mortgage Pass-Through
  Certificates Litigation*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012)..................................... *passim*

*Blakey v. McMurray*,
  488 N.Y.S.2d 286 (3d Dep't 1985) ................................................ 40

*Boilermakers National Annuity Trust v. WaMu
  Mortgage Pass Through Certificates, Series AR1*,
  748 F. Supp. 2d 1246 (W.D. Wash. 2010)..................................... 16, 34

*Brinckerhoff v. JAC Holding Corp.*,
  692 N.Y.S.2d 381 (N.Y. 1999)..................................................... 3

*Cangemi v. Advocate South Suburban Hospital*,
  845 N.E.2d 792 (Ill. 2006)..................................................... 6

*Carpenter v. Longan*,
  83 U.S. 271 (1872) ..................................................... 30

*Centaur Classic Convertible Arbitrage Fund Ltd.*
   *v. Countrywide Financial Corp.,*
   793 F. Supp. 2d 1138 (C.D. Cal. 2011) ....................................................... 42, 47

*Century Pacific, Inc. v. Hilton Hotels Corp.,*
   No. 03 Civ. 8258 (SAS), 2004 WL 868211
   (S.D.N.Y. Apr. 21, 2004) ........................................................................... 52

*City of Ann Arbor Employees Retirement System*
   *v. Citigroup Mortgage Loan Trust Inc.,*
   No. 08-1418, 2010 WL 6617866
   (E.D.N.Y. Dec. 23, 2010) ........................................................................... 16, 34

*CMMF, LLC v. J.P. Morgan*
   *Investment Management Inc.,*
   915 N.Y.S.2d 2 (1st Dept. 2010) ............................................................... 53

*In re Countrywide Financial Corp.*
   *Mortgage-Backed Securities Litigation,*
   834 F. Supp. 2d 949 (C.D. Cal. 2012) ....................................................... 4

*In re Countrywide Financial Corp.*
   *Securities Litigation,*
   588 F. Supp. 2d 1132 (C.D.Cal. 2008) ...................................................... 47

*In re DDAVP Indirect Purchaser*
   *Antitrust Litigation,*
   No. 05–CV–2237 (CS), 2012 WL 4932158
   (S.D.N.Y. 2012) ........................................................................................ 39

*DDJ Mgt., LLC v. Rhone Group L.L.C.,*
   905 N.Y.S.2d 118 (2010) .......................................................................... 34-35

*Dangler v. New York City Off Track Betting Corp.,*
   193 F.3d 130 (2d Cir. 1999) ...................................................................... 39

*DeLuna v. Burciaga,*
   857 N.E.2d 229 (Ill. 2006) ........................................................................ 6

*Deutsche Bank National Trust Co. v. Haque,*
   36 Misc. 3d 1203(A)
   (N.Y. Sup. Ct. Queens Cnty. 2012) ........................................................... 31

*Dexia Holdings, Inc. v.*
   *Countrywide Financial Corp.,*
   No. 11-cv-7165-MRP, 2012 WL 1798997
   (C.D. Cal. Feb. 17, 2012) .......................................................................*passim*

*Dodona I, LLC v. Goldman Sachs & Co.,*
   847 F. Supp. 2d 624 (S.D.N.Y. 2012) ....................................................... 38, 47

*Ellington Credit Fund, Ltd. v.*
   *Select Portfolio Servicing, Inc.,*
   837 F. Supp. 2d 162 (S.D.N.Y. 2011) ....................................................... 52

*Empire One Telecommunications, Inc.*
*v. Verizon New York, Inc.,*
888 N.Y.S.2d 714 (N.Y. Sup. New York Cnty. 2009)...................................... 53

*Employees Retirement System of the*
*Government of the Virgin Islands v.*
*J.P. Morgan Chase & Co.,*
804 F. Supp. 2d 141 (S.D.N.Y. 2011) ................................................ 20

*Federal Housing Finance Agency v.*
*UBS Americas Inc.,*
858 F. Supp. 2d 306 (S.D.N.Y. 2012) ........................................ 20, 44

*Federal Housing Finance Agency v.*
*Deutsche Bank AG,*
11 Civ. 6192 (DLC), ECF No. 140, slip op.
(S.D.N.Y. Nov. 12, 2012)............................................................. 41-42

*Flycell, Inc. v. Schlossberg LLC,*
No. 11 civ. 0915 CM, 2011 WL 5130159
(S.D.N.Y. Oct. 28, 2011) ................................................ 49

*Footbridge Ltd. v. Countrywide Home Loans, Inc.,*
No. 09 Civ. 4050 (PKC), 2010 WL 3790810
(S.D.N.Y. Sept. 28, 2010) .................................................... 15, 19, 44

*Genesee County Employee's Retirement System*
*v. Thornburg Mortgage Securities Trust 2006-3,*
825 F. Supp. 2d 1082 (D.N.M. 2011)........................................ 15, 33, 44

*Global Financial Corp. v. Triarc Corp.,*
693 N.Y.S.2d 479 (1999) ........................................................... 3

*Hendricks v. U.S. Bank N.A.,*
No. 10-849-CH, slip op.
(Mich. Trial Ct. Washtenaw Cnty. June 6, 2011) ............................ 24

*Horace v. LaSalle Bank, N.A.,*
No. 57-CV-2008-000362.00, slip op.
(Cir. Ct. Russel Cnty. Ala. Mar. 25, 2011)................................... 24

*Houbigant, Inc. v. Deloitte & Touche LLP,*
753 N.Y.S.2d 493 (1st Dept. 2003)................................................. 9

*HSH Nordbank AG v. UBS AG,*
941 N.Y.S.2d 59 (1st Dept. 2012)................................................. 37

*In re IndyMac Mortgage-Backed Securities Litigation,*
718 F. Supp. 2d 495 (S.D.N.Y. 2010)............................................. 44

*In re Initial Public Offering Securities Litigation,*
358 F. Supp. 2d 189 (S.D.N.Y. 2004)............................................. 36

*Jackson Jordan, Inc. v. Leydig, Voit & Meyer,*
633 N.E.2d 627 (Ill. 1984)........................................................... 7

*Kimmell v. Schaefer,*
   652 N.Y.S.2d 715 (1996) ............................................................... 51, 52

*King County, Washington v.*
   *IKB Deutsche Industriebank, AG,*
   863 F. Supp. 2d 288 (S.D.N.Y. 2012) ......................................... 52, 54

*Lama Holding Co. v. Smith Barney Inc.,*
   646 N.Y.S.2d 76 (1996) ........................................................................ 34

*Laub v. Faessel,*
   745 N.Y.S.2d 534 (1st Dep't 2002) ..................................................... 46

*Leon v. Martinez,*
   84 N.Y.2d 83, 87-88 (1994) ........................................................ 9, 19, 21

*Leyva v. National Default Servicing Corp.,*
   255 P.3d 1275 (Nev. 2011).............................................................. 21, 22

*Lipsky v. Commonwealth United Corp.,*
   551 F.2d 887 (2d Cir. 1976) ................................................................ 18

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,*
   594 F.3d 383 (5th Cir. 2010) .......................................................... 15-16

*Magnolia's at Bethany, LLC v.*
   *Artesian Consulting Engineers, Inc.,*
   No. S11C-04-013-ESB, 2011 WL 4826106
   (Del Sup. Ct. Sussex Cnty. Sept. 19, 2011) ....................................... 54

*Maine State Retirement System v.*
   *Countrywide Financial Corp.,*
   No. 10-cv-002-MRP, 2011 WL 4389689
   (C.D. Cal. May 5, 2011) ........................................................................ 2

*Maine State Retirement System v.*
   *Countrywide Financial Corp.,*
   No. 10-CV-0302 MRP, 2011 WL 1765509
   (C.D. Cal. Apr. 20, 2011) .................................................................... 54

*Massachusetts Mutual Life Insurance Co. v.*
   *Countrywide Financial Corp.,*
   No. 11-cv-10414 MRP, 2012 WL 3578666
   (C.D. Cal. Aug. 17, 2012) .................................................................. 2, 9

*Mauer v. Rubin,*
   926 N.E.2d 947, 963 (Ill. App. Ct. 2010).............................................. 6

*MBIA Insurance Corp. v.*
   *Countrywide Home Loans, Inc.,*
   928 N.Y.S.2d 229 (1st Dept. 2011)...........................................*passim*

*MBIA Insurance Corp. v.*
   *Countrywide Home Loans, Inc.,*
   No. 602825/2008, ECF No. 276
   (N.Y. Sup. Ct. New York Cnty. Dec. 22, 2010) .................................... 10, 11-12

*MBIA Insurance Corp. v.*
   *Countrywide Home Loans, Inc.,*
   No. 602825/2008, ECF No. 2070
   (N.Y. Sup. Ct. New York Cnty. Oct. 5, 2012) .................................... 9

*McKenna v. Wells Fargo Bank, N.A.,*
   No. 11-1650, 2012 WL 3553475
   (1st Cir. Aug. 16, 2012) .................................... 22, 31

*McMahan & Co. v. Donaldson, Lufkin*
   *& Jenrette Securities Corp.,*
   727 F. Supp. 833 (S.D.N.Y. 1989) .................................... 4

*National Bank of North America v.*
   *Flushing National Bank,*
   421 N.Y.S.2d 65 (1st Dept. 1979) .................................... 21-22

*National Credit Union Administration Board*
   *v. RBS Securities, Inc.,*
   No. 11-2340-RDR, 2012 WL 3028803
   (D. Kan. July 25, 2012) .................................... 15

*NECA-IBEW Health & Welfare Fund*
   *v. Goldman Sachs & Co.,*
   693 F.3d 145 (2d Cir. 2012) .................................... 48

*New Jersey Carpenters Health Fund*
   *v. DLJ Mortgage Capital, Inc.,*
   No. 08 CIV 5653 (PAC), 2010 WL 1473288
   (S.D.N.Y. Mar. 29, 2010) .................................... 48

*New Jersey Carpenters Health Fund*
   *v. Residential Capital, LLC,*
   No. 08 CV 8781(HB), 2010 WL 1257528
   (S.D.N.Y. Mar. 31, 2010) .................................... 17, 43

*New Jersey Carpenters Health Fund*
   *v. Residential Capital, LLC,*
   No. 08-8781 (HB), 2011 WL 2020260
   (S.D.N.Y. May 19, 2011) .................................... 16, 33

*New Jersey Carpenters Vacation Fund*
   *v. Royal Bank of Scotland Group, PLC*
   720 F. Supp. 2d 254 (S.D.N.Y. 2010) .................................... 44

*OSRecovery, Inc. v. One Groupe International, Inc.,*
   354 F. Supp. 2d 357 (S.D.N.Y. 2005) .................................... 50

*Patin v. State Board for*
    *Professional Medical Conduct*,
    911 N.Y.S.2d 184 (3d Dept. 2010).................................................... 46

*Plumbers Union Local No. 12 Pension Fund*
    *v. Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011) ................................................... 14, 44

*Provident Bank v. Community Home Mortgage Corp.*,
    498 F. Supp. 2d 558 (E.D.N.Y. 2007)...................................... 22, 31

*Public Employees Retirement System of Mississippi*
    *v. Merrill Lynch & Co.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010) ............................................ 45

*Robb Evans & Associates LLC v.*
    *Sun America Life Insurance*,
    No. 10 Civ. 5999 (GBD), 2012 WL 488257
    (S.D.N.Y. Feb. 14, 2012) ............................................................... 4

*RSM Production Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009) ...................................... 18-19

*S.E.C. v. Berry*,
    580 F. Supp. 2d 911 (N.D. Cal. 2008)........................................... 49

*Silver Oak Capital L.L.C. v. UBS AG*,
    920 N.Y.S.2d 325 (1st Dept. 2011)..................................... 46, 52-53

*Slutsky v. Blooming Grove Inn, Inc.*,
    542 N.Y.S.2d 721 (2d Dept. 1989)................................................ 21

*Stanfield Offshore Leveraged Assets, LTD.*
    *v. Metropolitan Life Insurance Company*,
    883 N.Y.S.2d 486 (1st Dept. 2009)................................................ 49

*Syncora Guarantee Inc. v.*
    *Countrywide Home Loans, Inc.*,
    No. 650042/2009, ECF No. 34
    (N.Y. Sup. Ct. New York Cnty. Mar. 31, 2010) ......................... 13-14

*Thrivent Financial for Lutherans v.*
    *Countrywide Financial Corp.*,
    No. 11-cv-7154-MRP, 2012 WL 1799028
    (C.D. Cal. Feb. 17, 2012) ................................................*passim*

*Tsereteli v. Residential Asset Securitization*
    *Trust 2006-A8*,
    692 F. Supp. 2d 387 (S.D.N.Y. 2010) ...................................... 44, 45

*Tucker v. American International Group, Inc.*,
    No. 3:09-CV-1499, 2012 WL 685461
    (D. Conn. March 2, 2012) ............................................................. 19

*Turner v. Nama*,
   294 Ill. App. 3d 19 (Ill. App. Ct. 1987)............................................................. 6

*UBS Securities LLC v. Highland Capital
   Management LP*,
   924 N.Y.S.2d 312 (N.Y. Sup. Ct. New York Cnty. 2011)................................ 50

*U.S. Bank, N.A. v. Bennett*,
   No. 11 MA 40, 2012 WL 2254189
   (Ohio Ct. App. 7th Dist. June 12, 2012).......................................................... 21

*U.S. Bank N.A. v. Ibanez*,
   941 N.E.2d 40 (Mass. 2011)............................................................................. 31

*U.S. ex rel. O'Donnell v. Bank of America Corp.*,
   12 Civ. 1422 (JSR) Complaint
   (S.D.N.Y. Oct. 24, 2012)................................................................................. 55

*In Re Wachovia Equity Securities Litigation*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011)............................................................. 20

*Wells Fargo Bank, N.A. v. Ford*,
   418 N.J. Super. 592
   (N.J. Super. Ct. App. Div. 2011)...................................................................... 22

*Western & Southern Life Insurance Co. v.
   Countrywide Financial Corp.*,
   11-cv-07166, ECF No. 157
   (C.D. Cal. Jun. 29, 2012)..........................................................................*passim*

*Western & Southern Life Insurance Co. v.
   Residential Funding Company, LLC*,
   No. A1105042, slip op.
   (Ohio Ct. Common Pleas June 6, 2012)........................................................... 28

## Statutes

26 U.S.C. § 860A............................................................................................ 22

C.P.L.R. § 202 ................................................................................................. 4

735 ILCS 5/13-215 ...................................................................................... 6-7

815 ILCS. 5/13(D) ........................................................................................... 6

Uniform Commercial Code, Article 3 .................................................21, 24, 30

Rule 9(b) ........................................................................................ 31, 32, 38, 49

Asset Management Fund, d/b/a AMF Funds, AMF Intermediate Mortgage

Fund, AMF Ultra Short Fund, AMF Ultra Short Mortgage Fund, AMF Short U.S.

Government Fund, and AMF U.S. Government Mortgage Fund (together "AMF")

respectfully submit this consolidated memorandum in opposition to Defendants'

motions to dismiss the Complaint.[1]

## PRELIMINARY STATEMENT

AMF invested over $192 million (AMF ¶ 1) in the RMBS Certificates at

issue in this case because the Defendants represented that the securities were

"mortgage-backed" and that the mortgages supposedly backing the securities had a

set of specific characteristics defining the risk of the investment.  All of these

representations were false: the securities were not mortgage-backed and the

mortgages falsely represented as backing the securities were far riskier than

disclosed.[2]

---

[1] Defendants Bank of America Corp., Bank of America, N.A., Bank of America
Mortgage Securities, Inc., and NB Holdings Corp. are referred to collectively as
"BofA."  Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch &
Co., Inc., Merrill Lynch Mortgage Lending, Inc., and Merrill Lynch Mortgage
Investors, Inc., are referred to collectively as "Merrill Lynch."  Countrywide
Financial Corp., Countrywide Home Loans, Inc., and CWMBS, Inc. are referred to
collectively as "Countrywide."  "CW--" refers to pages in the Countrywide
Defendants' Memorandum of Points and Authorities in Support of their Motion to
Dismiss; "BA--" refers to pages in the Bank of America and Merrill Lynch
Defendants' Motion to Dismiss.  "AMF ¶--" refers to paragraphs in AMF's
Complaint.

[2] As detailed in the Complaint, the Offering Materials substantially misled AMF as
to the risks of the underlying loans.  The seventeen certificates at issue supposedly
included not a single loan with CLTV greater than 100%.  Yet Plaintiffs have
discovered that each Securitization was larded with loans with CLTVs over 100%
and that the weighted average LTV/CLTV was substantially understated. For
example, in one Securitization (CWHL 2007-4), over 29% of the loans sampled had
CLTVs over 100% and the weighted average LTV/CLTV was understated by 15.6
percentage points.  Complaint, ¶ 87, Table 8; ¶ 90, Table 9.  Plaintiffs also
discovered that the Offering Materials overstated the percentage of loans in each of
these Securitizations that were on "owner-occupied" properties.  For example, one
of the Securitizations (BOAMS 2005-F) overstated the owner-occupied metric by
14.2%.  Complaint, ¶ 103, Table 10.  The Complaint also demonstrates that
Countrywide and the other loan originators abandoned their underwriting
guidelines in granting the loans underlying these Securitizations despite
representations to the contrary.  Complaint, ¶¶ 212-239.  And the biggest lie of all
was that these Securities were mortgage-backed.  Plaintiffs have discovered
evidence showing for each of the Securitizations at issue here that the securitization

1    Defendants' 77 pages of briefing recycles a hodge-podge of arguments from

2    their other RMBS cases. Yet, this Court has repeatedly upheld RMBS complaints

3    like AMF's that assert misleading statements as to underwriting standards and loan

4    to value ratios. *Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, No. 11-cv-

5    10414 MRP (MANx), 2012 WL 3578666 (C.D. Cal. Aug. 17, 2012); *Dexia*

6    *Holdings, Inc. v. Countrywide Fin. Corp.*, No. 11-cv-7165-MRP (MANx), 2012

7    WL 1798997 (C.D. Cal. Feb. 17, 2012); *Thrivent Fin. for Lutherans v. Countrywide*

8    *Fin. Corp.*, No. 11-cv-7154-MRP (MANx), 2012 WL 1799028 (C.D. Cal. Feb. 17,

9    2012); *Allstate Ins. Co v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164 (C.D. Cal.

10   2011); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-002-MRP

11   (MANx), 2011 WL 4389689 (C.D. Cal. May 5, 2011).

12   AMF's Complaint also alleges that the Defendants falsely represented that

13   the securities they sold to Plaintiffs were "mortgage-backed." They were not. As

14   the documents attached to the Complaint show, the mortgages supposedly

15   providing the security for these investments were not transferred to the RMBS

16   trusts as represented. Indeed, while some of the mortgages were transferred years

17   following the time of the securitizations, some mortgages have never been

18   transferred. As a consequence, the trusts did not own the underlying mortgages, but

19   rather were empty shells that lacked the legal right to collect and foreclose on the

20   mortgages they were represented to own.

21   Defendants assert that the Complaint suffers from a laundry list of pleading

22   defects and deficiencies. Stung by Plaintiffs' use of a widely accepted Automated

23   Valuation Model ("AVM") to support their allegations of false representations,

24   Defendants launch a specious attack on Plaintiffs' AVM-supported allegations

25   based on a completely erroneous reading of one paper published by one AVM

26   provider. To blunt Plaintiffs' assertions that the securities they purchased were not

27

28   trusts did not hold the underlying loans. AMF ¶¶ 240-264.

even mortgage-backed, Defendants rely heavily on this Court's recent opinion dismissing *Western & Southern Life Ins. Co. v. Countrywide Fin. Corp.*, 11-cv-07166, ECF No. 157 (C.D. Cal. Jun. 29, 2012), without acknowledging the substantial differences between the allegations in that case and the Complaint in this case that strongly support a different result here.  In challenging Plaintiffs' fraud claims based on misrepresented owner-occupancy data, Defendants fail to acknowledge that AMF's Complaint cures pleading defects that resulted in prior dismissals of similar claims.  Regarding Plaintiffs' assertion of a cause of action for negligent misrepresentation, Defendants ignore recent authority supporting Plaintiffs' allegations of a special relationship imposing a duty on Defendants to provide truthful information.  And in asserting that AMF's claims are time-barred, Defendants erroneously assert the application of Florida and Delaware law and fail to address the tolling that flows from their fraudulent concealment.

For these reasons, and as more fully discussed below, Defendants' motions to dismiss the Complaint must be denied.

## ARGUMENT

## I.    AMF's CLAIMS ARE TIMELY

### A.    Illinois Law Applies to Plaintiffs' Claims under the New York Borrowing Statute

Because the Plaintiffs' principal place of business was in Illinois at the time of the relevant purchases[3] and therefore their causes of action accrued in Illinois, New York law dictates that the Illinois statute of limitations applies to Plaintiffs' claims.  *See Global Fin. Corp. v. Triarc Corp.*, 693 N.Y.S. 2d 479, 480 (1999) (a non-New York plaintiff's claim must "be timely under the limitations periods of both New York and the jurisdiction where the cause of action accrued."); *Brinckerhoff v. JAC Holding Corp.*, 692 N.Y.S.2d 381, 382 (N.Y. 1999) ("pursuant

---

[3] *See* Plaintiffs' Request for Judicial Notice in Support of  Their Opposition to Defendants' Motion to Dismiss, Exhibit A.

to New York's borrowing statute, CPLR 202, the applicable Statute of Limitations is that of Georgia, since that is where [plaintiff, a Delaware corporation] had its principal office and where [plaintiff's] alleged monetary damages would be felt."); *Robb Evans & Associates LLC v. Sun Am. Life Ins.*, No. 10 Civ. 5999 (GBD), 2012 WL 488257 (S.D.N.Y. Feb. 14, 2012) ("[W]hat constitutes the sole residency of a business entity for the purpose of the New York borrowing statute is its principal place of business."). This Court recently held that a corporation with its principal place of business in New York was a New York resident for purposes of New York's borrowing statute, despite the fact that its place of incorporation was Delaware. "Establishment of a principal place of business in New York is a sufficiently 'significant connection' to New York to qualify as a resident for purposes of C.P.L.R. § 202." *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 834 F. Supp. 2d 949, 958 (C.D. Cal. 2012).

The BofA Defendants argue that the Delaware statute of limitations should apply to Plaintiffs' claims because the Plaintiffs are Delaware statutory business trusts, ignoring the paramount importance that courts in New York have placed on business entities' principal place of business. BA 8-10. While the issue has not been addressed in the context of a statutory business trust, courts have held that in the context of a partnership, the principal place of business determines where the cause of action accrued, rather than the jurisdiction under whose laws the partnership was formed. *See, e.g., McMahan & Co. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 727 F. Supp. 833, 834 (S.D.N.Y. 1989) ("A principal purpose of the borrowing statute is to protect New York residents from forum shopping by foreign plaintiffs. That purpose is best served by recognizing that while plaintiff may be a 'creature of New York ... law,' its residence is where it conducts its day-to-day affairs.") (citation omitted).

Because the principal place of business of the Plaintiffs was in Illinois at the time of accrual, under New York's borrowing statute, Illinois' statute of limitations applies to the Plaintiffs' claims.

**B.    Plaintiffs' Claims Are Timely Under Illinois Law**

**1.    Plaintiffs' Time to Bring Their Claims Was Tolled Due to the Defendants' Fraudulent Concealment**

Defendants engaged in a course of conduct to conceal from Plaintiffs the fraud through several actions, including: (a) continuing to market and solicit the sale of Certificates after their issuance and reasserting the misrepresentations in the Offering Documents regarding LTV/CLTV ratios, owner-occupancy rates, adherence to originator lending guidelines, and the transfer of mortgages and notes to the Trusts; (b) filing documents such as quarterly and annual reports with the U.S. Securities and Exchange Commission ("SEC") that portrayed the RMBS securitization market as stable, thereby perpetuating the misrepresentations regarding LTV/CLTV ratios, owner-occupancy rates, and adherence to originator lending guidelines, and lulling Plaintiffs into the false belief that the securities they purchased were in fact mortgage-backed; (c) providing investors with reports and updates regarding the status and performance of the Trusts further lulling Plaintiffs into the false belief that the securities they purchased were in fact mortgage-backed; and (d) concealing the fact that Defendants were intentionally failing to assign and transfer the notes and mortgages to the Trusts, which resulted in the Trusts being unable to efficiently and effectively collect on notes that were purportedly backing the Trusts.

Through these actions, Defendants misrepresented and concealed material facts. Defendants knew at the time they made the representations that they were untrue. Plaintiffs did not know that the representations were untrue when they were made and for a considerable time thereafter. Defendants reasonably expected that Plaintiffs would act at the time of purchase and continue to act thereafter based

1  upon the representations.  Plaintiffs reasonably relied upon the representations in

2  good faith to their detriment.

3          Under Illinois law the relevant statutes of limitations and repose (815 ILCS

4  5/13(D)) are tolled by both the fraudulent concealment statute (735 ILCS 5/13-215

5  ("§13-215")) and the doctrine of equitable estoppel.[4]  The common-law doctrine of

6  equitable estoppel parallels the fraudulent concealment statute. *Turner v. Nama*,

7  294 Ill. App. 3d 19, 26 (Ill. App. Ct. 1987). The Illinois Supreme Court has held

8  that §13-215 applies equally to statutes of limitations and repose.  *DeLuna v.*

9  *Burciaga*, 857 N.E.2d 229, 243 (Ill. 2006) ("We see no reason why section 13–215

10 should not apply to statutes of repose…").

11         Under §13-215[5], Plaintiffs have five years from discovery of the fraudulently

12 concealed claim to bring suit.  "If a person liable to an action fraudulently conceals

13 the cause of such action from the knowledge of the person entitled thereto, the

14 action may be commenced at any time within 5 years after the person entitled to

15 bring the same discovers that he or she has such cause of action, and not

16 afterwards." §13–215.  Section 13-215 is applicable to Plaintiffs' claims.  *DeLuna*,

17 857 N.E. 2d at 240 ("The plain language of section 13–215 refers to 'an action,'

18 without qualification as to the type of action to which it applies.")[6]

19

20 _____

[4] The statute of repose clearly does not bar Plaintiffs' claims relating to their
21 purchase of seven certificates as Plaintiffs commenced litigation within five years
of these purchases (BAFC 2006-A (1B1), BOAMS 2005-C, BOAMS 2005-F,
CWHL 2005-22, CWMBS 2006-HYB3, CWHL 2007-4 and CWHL 2008-2R).

22 [5] "Fraudulent concealment, as codified in section 13–215, is not a cause of action in
and of itself; rather, it acts as an exception to the time limitations imposed on other,
23 underlying causes of action." *Cangemi v. Advocate S. Suburban Hosp*, 845 N.E.2d
792, 805 (Ill. 2006).

24 [6] Some lower courts in Illinois have held principally in legal and medical
25 malpractice cases that "where a plaintiff has been put on inquiry as to a defendant's
fraudulent concealment within a reasonable time before the ending of the statute of
26 repose, such that he should have discovered the fraud through ordinary diligence,
he cannot later use fraudulent concealment as a shield in the event that he does not
27 file suit within the statutory period. *See, e.g., Mauer v. Rubin*, 926 N.E.2d 947, 963
(Ill. App. Ct. 2010).  However, such holdings are in direct conflict with the plain
28 language of §13-215.

Plaintiffs commenced this action on March 1, 2012. Accordingly, the action is timely under Illinois law unless Defendants can establish that Plaintiffs discovered the fraud before March 1, 2007. Defendants make no such argument as there is no conceivable factual basis for it. Accordingly, Plaintiffs' claims are timely under §13–215.[7]

In addition, Illinois' doctrine of equitable estoppel also tolls the statutes of limitation and repose. This is true whether or not Defendants intentionally concealed their fraud. "[I]t is not necessary that the defendant intentionally mislead or deceive the plaintiff, or even intend by its conduct to induce delay. Rather, all that is necessary for invocation of the doctrine of equitable estoppel is that the plaintiff reasonably rely on the defendant's conduct or representations in forbearing suit." *Jackson Jordan, Inc. v. Leydig, Voit & Meyer*, 633 N.E.2d 627, 632 (Ill. 1984) (internal citations omitted) (quoting *Witherell v. Weimer*, 421 N.E.2d 869, 876 (Ill. 1981) quoting *Bomba v. W.L. Belvidere, Inc.*, 579 F.2d 1067, 1071 (7th Cir. 1978)).

## 2. The Illinois Three-Year Statute of Limitations Does Not Bar Plaintiffs' Claims

Whether Plaintiffs' claims are barred by the Illinois three year statute of limitations is a question of fact. This Court has held that to trigger the limitations period under the Illinois blue sky law, Defendants must demonstrate that Plaintiffs had actual knowledge of facts that should have triggered an investigation and that such investigation would have unearthed actual knowledge of a violation.[8] *Allstate Ins. Co.* v. *Countrywide*, 824 F. Supp. 2d at 1183. As this Court stated, whether

---

[7] In *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164 (C.D. Cal. 2011), this Court dismissed claims barred by the Illinois five-year statute of repose. However, the Court did not consider whether the statute of repose was tolled by fraudulent concealment.

[8] Defendants argument regarding the public nature of the assignments and satisfactions cited in the complaint fails for this reason. Defendants do not argue, nor could they, that Plaintiffs had actual knowledge of the mortgage documents cited prior to March 1, 2009.

Defendants have met both tests is a fact-specific inquiry that is better determined on a motion for summary judgment. *Id.* ("The first will require Defendants to establish what Allstate knew and when it knew it. The second inquiry will require Defendants to show that a reasonable investigation would have revealed a violation of New York law. That question is factual and intimately tied up with the (also fact-intensive) question of underlying liability. It is therefore better addressed at the summary judgment stage.").

## II.  THE COMPLAINT ADEQUATELY PLEADS NUMEROUS MISREPRESENTATIONS

### A.  Occupancy Misrepresentations State a Claim for Fraud

The allegations in the Complaint concerning misrepresentations of owner-occupancy rates in the Securitizations state a claim for fraud. Specifically, the Complaint alleges that Defendants conducted due diligence on a sample of loans from the Securitizations, including with respect to whether the loans were on owner-occupied properties. AMF ¶ 106. Using the same kind of credit history information available to Defendants during their due diligence process (but not available to Plaintiffs at the time), Plaintiffs have recently conducted a loan-level investigation into the very same mortgages that were represented to have been in the Securitizations, which revealed that the rates of owner-occupancy in the Securitizations were significantly overstated in the Offering Documents. AMF ¶ 103 Table 10. Data from Defendants' due diligence vendor demonstrates that Defendants knowingly waived-in large percentages of non-compliant loans at or around the time of the Securitizations. AMF ¶ 110.

Indeed, Countrywide has recently conceded in other litigation that an average of nearly 30% of the loans in a set of 14 Securitizations were flagged by third-party due-diligence firms as noncompliant with Countrywide's underwriting guidelines. Stunningly, Countrywide admitted that as to one of the Securitizations a third-party due diligence firm flagged 56.5% of the loans as non-compliant. *See*, Countrywide

Memorandum of Law in Support of Motion for Summary Judgment at p. 13, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, ECF No. 2070 (N.Y. Sup. Ct. New York Cnty. Oct. 5, 2012).

These facts strongly support the inference that Defendants were aware that the owner-occupancy rates they were reporting in the Offering Documents were false or misleading, but nevertheless reported those false statistics without disclosing the negative results of their own due diligence to Plaintiffs or other investors, in order to make the loan pools appear more credit-worthy.  Under New York law, these allegations are sufficient to state a fraud claim.[9]  *Houbigant, Inc. v. Deloitte & Touche LLP*, 753 N.Y.S.2d 493, 498 (1st Dept. 2003) (scienter may be inferred from surrounding circumstances); *Leon v. Martinez,* 84 N.Y.2d 83, 87-88 (1994) (plaintiffs are afforded all reasonable inferences on a motion to dismiss).

Since Defendants had information in their possession that would have disproved the owner-occupancy rates reported in the Offering Documents, the disclaimers Defendants rely on for dismissal do not absolve them of responsibility for their misrepresentations.  For the same reason, the cases relied on by Defendants, including this Court's decision in *Mass. Mut.*, 2012 WL 3578666, at*1, are distinguishable.

### B.   Plaintiffs Have Adequately Alleged Misrepresentations Regarding LTV/CLTV Ratios

Defendants' arguments contesting the falsity of the LTV and CLTV ratios in the Offering Documents address only the magnitude of the falsity.  Defendants do not seriously contest Plaintiffs' allegations and analysis that the LTV and CLTV ratios provided in the Offering Documents were wrong.

---

[9] Even if the Court were to find that the Complaint is insufficient to allege that Defendants acted with scienter with respect to the owner occupancy misrepresentations, the Complaint states a claim for negligent misrepresentation based on these facts, as discussed *infra* in Section IX.

The Complaint alleges in detail for each Securitization that the Offering Documents significantly understated the LTV and CLTV ratios on a substantial number of the loans included in the Securitizations. AMF ¶¶ 84-86. Plaintiffs' allegations rest in large part on a statistical analysis of a large sample of loans purportedly underlying the Securitizations. By applying an AVM to the loan sample, Plaintiffs were able to determine that a significant percentage of the loans purportedly underlying the Securitizations did not have the LTV or CLTV ratios that were represented in the Offering Documents. *Id*. The use of this sampling methodology has been upheld by other courts in denying motions to dismiss RMBS fraud cases on grounds similar to those urged by Defendants. *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, ECF No. 276, slip op. at 8-12 (N.Y. Sup. Ct. New York Cnty. Dec. 22, 2010) ("MBIA Sampling Order") and *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 233 (1st Dept. 2011) (affirming denial of motion to dismiss Plaintiff's fraud claims based on allegations that offering documents misstated LTV ratios based on sampling).

### 1. Defendants' "Margin of Error" Argument is Specious

BofA and Merrill Lynch completely misrepresent the alleged "margin of error" for an AVM and its relationship to the falsity of the LTV and CLTV ratios shown by Plaintiffs. BA 27. The cited CoreLogic white paper does not address margin of error at all. Rather, the stated purpose of the CoreLogic white paper was to assess "the accuracy of original and retrospective AVMs compared to sale prices." CoreLogic, "Retrospective AVMs – How Do They Work & How Accurate Are They?" at 1 (White Paper, Aug. 2010). CoreLogic's white paper shows that original AVMs were less accurate than retrospective AVMs, such as the retrospective AVM used by Plaintiffs to assess the accuracy of the LTV and CLTV ratios. As shown in the CoreLogic white paper, a retrospective AVM provides a higher percentage of values that are within 15% of the sale price for the underlying

property.  The 15%, however, is not the "margin of error" as misrepresented by Defendants, but rather simply a percentage chosen by CoreLogic to compare the accuracy of original and retrospective AVMs to the sale price.  CoreLogic could have used 5%, 10% or any other percentage to conduct this comparison, and CoreLogic's use of 15% says absolutely nothing about the "margin of error" for an AVM.  In assessing why the accuracy of a retrospective AVM is important, CoreLogic concludes:

> [I]f retro AVMs are consistently more accurate relative to historical sales prices, they offer an inexpensive way to initially test the quality of the original valuations, whether obtained through an appraisal or AVM.  If the retrospective AVM reveals a significant price discrepancy, it might be time to dig deeper into the original valuation and/or loan file.

*Id.* at 2.  Plaintiffs' analysis shows that there are significant discrepancies between the original values used by Defendants and the values shown by a retrospective AVM.   AMF ¶ 87 Table 8, ¶ 90 Table 9.  Accordingly, the Court should reject Defendants' misguided and unsupportable assertions regarding the AVM used by Plaintiffs.

Even if Plaintiffs were required to provide a "margin of error" at the motion to dismiss stage – and they are not – contrary to Defendants' assertion, Plaintiffs have provided details regarding the sampling methodology employed (applying an AVM to determine the value of the underlying properties) and the data used (the actual loans from the Securitizations).  AMF ¶ 88.  Defendants fail to provide any authority for the proposition that Plaintiffs must allege the "error rate" of their analysis, and in any event Defendants cannot establish on a motion to dismiss what level of any such error rate would warrant dismissal of Plaintiffs' claims.  As Justice Bransten found in the *MBIA v. Countrywide* matter, allowing the parties to use samples from the securitizations does not prejudice the parties and, at trial, Defendants may attempt to rebut Plaintiffs' sampling analysis with their own

sampling analysis and "each party will then challenge the other's proofs."  MBIA Sampling Order at 13.

> **2.    Plaintiffs' Allegations Establish Falsity Even if Sale Prices Were Sometimes Used for LTV Ratios**

As stated above, Defendants do not contest Plaintiffs' analysis that the retrospective AVM demonstrates the statements in the Offering Documents regarding LTV/CLTV ratios were false.  Rather, Defendants argue that it is possible, in some instances, that the AVM would not prove falsity; *i.e.*, the magnitude of Defendants' false statements may not be as great as Plaintiffs have demonstrated.

BofA and Merrill Lynch speculate that some LTV/CLTV ratios in the Offering Documents may have included some loans that used the sales price instead of an AVM or appraisal, and therefore the later use of an AVM to determine the value would not be appropriate in analyzing the LTV/CLTV ratio.  BA at 28-29. Defendants do not, however, specify whether in fact any of the LTV/CLTV ratios for the Securitizations used sale prices and if so, how often that occurred.  Like their erroneous margin of error assertion, Defendants' assertion that the LTV/CLTV ratios in the Offering Documents may have included the sales price for some unspecified number of loans goes to, at most, the magnitude of the falsehoods contained in the Offering Documents and does not undermine Plaintiffs' analysis and allegations that the LTV/CLTV ratios in the Offering Documents were false.

> **3.    Defendants Knew the Appraisals Were False**

BofA's and Merrill Lynch's assertion that appraisals are mere opinions and that Plaintiffs have not alleged that any of the appraisers did not believe the values they ascribed to the properties (BA 26) confuses the issue of who must know an appraisal is false in order for Defendants to be liable for the misrepresentations in the Offering Documents.  Whether or not the individual appraisers actually believed the appraisals they provided were accurate is irrelevant to this case; those

individuals are not defendants in this action.  Similarly, whether the non-party originators knew appraisals were inaccurate is irrelevant.  The relevant question is whether Defendants knew or had sufficient information that they were reckless in not knowing that the appraisals were false.  *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 769 (S.D.N.Y. 2012) ("Because the appraisal 'opinions' were expressed by both the originators and Bear Stearns (by incorporating the originators' representations into the Offering Documents), Plaintiffs can state a claim by showing that either one disbelieved the appraisal amounts.").

As alleged in the Complaint, Defendants had access to the loan files for the underlying mortgages, which allowed them to determine that the appraisals were inaccurate.  AMF ¶ 272.  The Complaint further alleges that when Defendants published the LTV/CLTV data in the Offering Documents, they knew those ratios were false because, in part, the appraisals were inaccurate.  AMF ¶ 92.  Defendants' knowledge of the deliberate inflation of this appraisal-based data is directly inferable from (a) Defendants' due diligence of the loan files which gave them knowledge that a significant portion of the loans did not comply with the stated underwriting guidelines of the originator, including with respect to LTV/CLTV, and (b) Plaintiffs' loan-level investigation of the specific Securitizations at issue in this litigation showing that the Certificates Plaintiffs purchased were supposedly backed by non-conforming loans.  AMF ¶ 87 Table 8, ¶ 90 Table 9.  Many New York courts have recently found factual allegations comparable to those in the Complaint supported an inference that the issuer and/or underwriter knew that the representations in the offering documents concerning LTV/CLTV were false.  *See*, *MBIA Ins. Corp.*, 928 N.Y.S.2d at 233 (affirming denial of motion to dismiss plaintiff's fraud claims asserting that offering documents misstated LTV ratios based on sampling); *Syncora Guarantee Inc. v.*

*Countrywide Home Loans, Inc.*, No. 650042/2009, ECF No. 34, slip op. (N.Y. Sup. Ct. New York Cnty. Mar. 31, 2010) (denying motion to dismiss complaint alleging misstatement of LTV ratios in the offering documents); *Allstate Ins.*, 824 F. Supp. 2d at 1185 (applying New York law and denying motion to dismiss fraud claims based on LTV misrepresentation); *see*, *e.g.*, *Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 775 (1st Cir. 2011) (finding opinions are actionable as misrepresentations if the opinion was not "honestly held when formed").

Contrary to Defendants' assertion, Plaintiffs have alleged facts showing that Defendants knew the appraisals were flawed – namely that Defendants had access to the loan files and, both through their own due diligence efforts and those of Clayton and other third-party due diligence providers, Defendants were able to determine that appraisals were inaccurate.  AMF ¶¶ 105-116.  Despite knowing that the underlying appraisals were inaccurate, Defendants included the LTV and CLTV ratios calculated using those appraisals in the Offering Documents.  *Id.*

### 4.    Risk Disclosures Do Not Relate to Defendants' Fraud

Countrywide, acknowledging that this Court has previously sustained similar claims premised on similar allegations as those made by Plaintiffs here, seeks dismissal of Plaintiffs' claims regarding LTV/CLTV ratios on the ground that the Offering Documents (a) noted the value of the mortgaged properties may change after the Securitizations are issued and (b) purportedly disclosed "the relevant characteristics of the mortgage loan collateral. . . ."  CW 21.  On Countrywide's first point, whether or not the value of the mortgage properties changed after the Securitizations were issued is irrelevant.  Plaintiffs purchased the Securitizations based upon Defendants' representations of the value of the properties at the time the Securitization was issued, and the corresponding LTV/CLTV ratios at that time.  As alleged in the Complaint, Defendants' misrepresentations regarding the LTV/CLTV

1   ratios were material, Plaintiffs relied upon those misrepresentations, and Plaintiffs

2   were harmed by Defendants' misrepresentations.  AMF ¶ 92.  The innocuous

3   statement in the Offering Documents that home values may change over time

4   provides no cover for Defendants' misrepresentations.  *See*, *e.g.*, *Nat'l Credit Union*

5   *Admin. Bd. v. RBS Sec., Inc.*, No. 11-2340-RDR, 2012 WL 3028803, at *33 (D.

6   Kan. July 25, 2012) (reasoning that at the pleading stage, "the court cannot find that

7   these warnings clearly reach the issue of intentional malfeasance with regard to

8   LTV limits and property appraisals").

9        On the second point, Countrywide provides no details or citations to establish

10  the purported disclosure of "the relevant characteristics of the mortgage loan

11  collateral."  CW 21.  Plaintiffs' Complaint alleges numerous materially false

12  statements regarding the characteristics of the mortgage loan collateral in the

13  Offering Documents, including owner-occupancy and LTV/CLTV ratios.  AMF ¶

14  87 Table 8, ¶ 90 Table 9, ¶ 103 Table 10.  Defendants' bare assertion does not

15  overcome Plaintiffs' specific allegations.

16             **5.    Cure and Repurchase Is Not the Proper Remedy**

17       Countrywide also raises the "cure or repurchase" provision of the Offering

18  Documents as a ground for dismissal, citing *Lone Star Fund V (U.S.), L.P. v.*

19  *Barclays Bank PLC*, 594 F.3d 383, 389 (5th Cir. 2010) and *Footbridge Ltd. v.*

20  *Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at

21  *16 (S.D.N.Y. Sept. 28, 2010).  CW 21, n.23.  Defendants fail to acknowledge,

22  however, that *Lone Star* and *Footbridge* are very much the minority view, and that

23  most courts interpreting the "cure or repurchase" provision have rejected the

24  holding that a "cure and repurchase" provision constitutes a contractual waiver of

25  remedies.  *See Genesee Cnty. Employee's Ret. Sys. v. Thornburg Mortg. Sec. Trust*

26  *2006-3*, 825 F. Supp. 2d 1082, 1190-92 (D.N.M. 2011) (finding that policy and the

27  provisions of the securities anti-fraud laws prevent contractual waivers of

28

remedies); *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781 (HB), 2011 WL 2020260, at *6 (S.D.N.Y. May 19, 2011) ("[T]he overwhelming majority of the courts in this Circuit have rejected the *Lone Star* approach"); *City of Ann Arbor Emps. Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, No. 08-1418, 2010 WL 6617866, at *7 (E.D.N.Y. Dec. 23, 2010) (finding *Lone Star* inapplicable where plaintiff alleges "widespread misrepresentations regarding the nature of underwriting practices" and, in any event, "the Second Circuit has never accepted [the *Lone Star*] approach"); *Boilermakers Nat'l Annuity Trust v. WaMu Mortg. Pass Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1256 (W.D. Wash. 2010) (holding that unlike in *Lone Star*, plaintiffs allegations are not simply based on a representation about the absence of delinquent loans but rather include allegations regarding misstatements and omissions regarding underwriting guidelines).

Most courts agree that promoters and sellers of RMBS investments cannot tell lies about widespread and systematic failures to comply with material loan criteria and then hide behind cure provisions intended to remedy occasional deviations. *Boilermakers Nat'l Annuity Trust*, 748 F. Supp. 2d at 1256 ("The purchase and sale agreements thus cannot shield Defendants from liability at the pleadings stage.").  Further, as alleged in the Complaint, Defendants did not follow the cure and repurchase provision, but instead "negotiated discounts of their purchase prices of such loans from the originators on the basis of the defects in the loans' credit quality – discounts that the Defendants did not pass on to investors, but rather kept for themselves, passing on only the risk."[10]   AMF ¶ 112. Accordingly, the Countrywide Defendants' argument that the cure and repurchase provision bars all claims for fraud or misrepresentations should be rejected.

_____

[10] The recently filed lawsuit by the New York Attorney General against J.P. Morgan Chase similarly alleges that, instead of following the cure and repurchase provisions, issuers kept knowingly poor loans in RMBS and obtained discounts from originators for these deficient loans.

### C.   Plaintiffs Have Adequately Alleged Widespread Failures to Comply with Underwriting Guidelines and Defendants' Knowledge of Such Failures

BofA and Merrill Lynch take Plaintiffs to task for not detailing, *ad nauseam*, the "rampant underwriting failures… throughout the period of the Securitizations" which have been extensively detailed in governmental investigations and news reports.  AMF ¶ 153.  BA 21-22.  In presenting allegations regarding the mortgage industry's ubiquitous failure to follow underwriting guidelines, Plaintiffs focused on the worst of the worst, as documented by the OCC's "Worst Ten" Report.  AMF ¶¶ 154, 195, 199, 220 .  Defendants criticize Plaintiffs' discretion, arguing that the absence of allegations against every mortgage originator renders insufficient Plaintiffs' allegation that there was a widespread departure from originating guidelines among originators.  Although additional evidence of originator wrongdoing is available and could be pled in an amended complaint, such overkill should not be required to establish Plaintiffs' allegation that Defendants knew loans in the pools purportedly underlying their securitizations failed to comply with the originator's underwriting guidelines, particularly because Plaintiffs also allege that Defendants conducted due diligence on the loans included in their securitizations and knew from that due diligence that substantial numbers of loans did not conform to the originator's underwriting guidelines.  AMF ¶ 105-116 ; *see, e.g., New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781(HB), 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010) ("'Plaintiffs provide a credible inference that originators of these underlying loan pools systematically disregarded underwriting guidelines' because of 'widespread evidence' of this activity by the originator along with the fact that 'the loan pools provided by those same originators failed at considerable levels.'") (quoting *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group,* 720 F. Supp. 2d 254, 270

(S.D.N.Y. 2010) (denying motion to dismiss fraud claims based on systematic disregard of underwriting standards)).

BofA and Merrill Lynch argue that Plaintiffs should not be entitled to rely on allegations of failure to follow origination guidelines that are derived from governmental investigations or complaints in other actions.[11]  Defendants' cited authority, however, does not support Defendants' suggestion that the Court ignore Plaintiffs' allegations.  In *In re Bear Stearns Mortg. Pass-Through Certificates Litigation*, a case applying New York law and involving alleged misrepresentations in the sale of mortgage-backed securities, Judge Swain found that because "[t]he Complaint is replete with public reports . . . that describe the systematic disregard of underwriting standards by the specific parties involved in the origination of the loans populating the offerings," the facts alleged in the complaint were "sufficient to support a reasonable inference that the loan pools were inferior in credit quality to loans that would have been selected had Defendants' originators employed the sort of underwriting standards described in the Offering Documents."  *In re Bear Stearns*, 851 F. Supp. 2d at 768-69.  In specifically rejecting the holding of *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009), cited by Defendants, Judge Swain explained that in the decision from which *Fridman* emanated, *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976):

> The Circuit reiterated the strong presumption against striking portions of the pleadings and cautioned that its holding was limited to 'the facts of this case.'  Nonetheless, some courts in this district have stretched the holding in *Lipsky* to mean that any portion of a pleading that relies on unadjudicated allegations in another complaint is immaterial under Rule 12(f).

---

[11]  In arguing that Plaintiffs' allegations regarding Wells Fargo are defective (BA 22), BofA and Merrill Lynch seemingly confuse the issue of who the allegations regarding the widespread failure to follow underwriting guidelines are meant to address.  Plaintiffs provide allegations showing that various originators failed to follow their origination guidelines not to establish liability against all of the originators – which except for Defendant Countrywide Home Loans and Bank of America, N.A. are not defendants in these actions – but rather to establish liability against Defendants for knowing through their due diligence of the underlying loans in their securitizations and Defendants' own origination practices that the underwriting guidelines were not being followed.

1
2
3
4

> *See*, *e.g.*, *RSM Prod. Corp. v. Fridman*, 643 F.Supp.2d 382, 403 (S.D.N.Y.2009). ***Neither Circuit precedent nor logic supports such an absolute rule.*** Not all complaints are created equal – while some barely satisfy the pleading requirement, others are replete with detailed factual information of obvious relevance to the case at hand. (emphasis added) (citation omitted).

5   *In re Bear Stearns*, 851 F. Supp. 2d at 768*, n. 24*; *and see Tucker v. American Int'l*

6   *Grp., Inc.*, No. 3:09-CV-1499, 2012 WL 685461, at *4 (D. Conn. March 2, 2012)

7   (finding *Fridman* inapposite because "plaintiff has neither moved for summary

8   judgment based on allegations nor contended that other non-adjudicated lawsuits

9   comprise evidence of defendants' wrongdoing."); *cf. Footbridge*, 2010 WL

10   3790810, at *6 (partially following *Fridman* but substantially denying defendants'

11   motion to strike because "Defendants have failed to demonstrate that 'no evidence

12   in support of the[se] allegation[s] would be admissible.' [O]rdinarily neither a

13   district court nor an appellate court should decide to strike a portion of the

14   complaint – on the grounds that the material could not possibly be relevant – on the

15   sterile field of the pleadings alone." (quoting *Lipsky*, 551 F.2d at 893)).

16        BofA and Merrill Lynch further argue that Plaintiffs' allegations regarding

17   Defendants' due diligence, including Defendants' use of Clayton to analyze

18   whether loans complied with originators' underwriting guidelines, do not

19   "demonstrate falsity" because they are not tied to the exact loans at issue in this

20   case. In addition to misstating the burden on a motion to dismiss as requiring

21   Plaintiffs to "demonstrate falsity," the Merrill Lynch Defendants also improperly

22   seek to obtain the benefit of competing factual inferences, whereas it is of course

23   Plaintiffs who are entitled to the benefit of any such inferences. *Leon,* 84 N.Y.2d at

24   87-88 (holding that on a motion to dismiss, "the pleading is to be afforded a liberal

25   construction . . . accept[ing] the facts as alleged in the complaint as true,

26   accord[ing] plaintiffs the benefit of every possible favorable inference, and

27   determin[ing] only whether the facts as alleged fit within any cognizable legal

28

1  theory.") (citation omitted).  Courts have routinely denied motions to dismiss based

2  on LTV/CLTV misrepresentations where the complaint contained loan-level

3  analysis of precisely the kind that is alleged in the Complaint.  *See Fed. Hous. Fin.*

4  *Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012) (holding that

5  FHFA alleged actionable misstatements with regard to the LTV ratios that

6  defendants reported in their offering materials); *In Re Wachovia Equity Sec. Litig.*,

7  753 F. Supp. 2d 326 (S.D.N.Y. 2011) (holding that plaintiff's claims of the

8  manipulation of the appraisal process prove that LTV allegations must be

9  actionable); *Emps. Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase*

10  *& Co.*, 804 F. Supp. 2d 141 (S.D.N.Y. 2011) (denying motion to dismiss claims of

11  inflated LTV ratios); *cf. In Re Bear Stearns*, 851 F. Supp. 2d 746 (holding that

12  Clayton reports and pressure to inflate appraisal values supports inference that

13  originators did not believe appraisal numbers were accurate, even without loan-

14  level data).

15       In this case, Defendants suggest that the Court adopt Defendants' apparent

16  (though unstated) factual position that *no* loan reviewed by Clayton was included in

17  the Securitizations, and thereby reject Plaintiffs' factual inference that because

18  Clayton reviewed the loan files for more than 10,000 loans for BofA, almost 2,500

19  loans for Countrywide, and more than 55,000 loans for Merrill Lynch from the first

20  quarter of 2006 through the second quarter of 2007, at least *some* of those loans

21  were included in the Securitizations purchased by AMF.  AMF ¶ 106.  As further

22  alleged in the Complaint, even if such loans were not included, Defendants had

23  sufficient information regarding the percentage of loans that failed to comply with

24  underwriting guidelines that it would be reckless for them to fail to assume that a

25  similar percentage of the unsampled loans were subject to similar deficiencies.

26  AMF ¶ 109-111.  Accepting Plaintiffs' allegations as true and providing Plaintiffs

27

28

the benefit of every possible inference requires that Defendants' motion to dismiss on this ground be denied. *Leon,* 84 N.Y.2d at 87-88. *See also* n. 3, *supra.*

### D.   The Complaint Adequately Pleads Fraud and Related Claims Based On the Misrepresentations that the Securities Were "Mortgage-Backed"

The most important characteristic of a mortgage-backed security is that it actually be backed by mortgages. Plaintiff found, and alleged in their Complaint, documents showing that the mortgages that were represented as being included in the Securitizations and underlying the Certificates were in fact never transferred to the Trusts, such that the Trusts were in fact empty and the so-called mortgage-backed Certificates were, in actuality, not backed by mortgages. AMF ¶¶ 250-251, 253-254.

#### 1.   Transfers of Mortgage Loans Require Indorsement and Delivery of Notes to the Transferee

What are commonly referred to as "mortgages" are loans secured by a pledge of real property. The loan obligations are evidenced by notes executed by the borrower. These notes are negotiable instruments governed by Article 3 of the Uniform Commercial Code;[12] in order for them to be transferred, they must generally (1) be indorsed by their holder, either in blank or to the transferee, and then (2) delivered to the transferee.[13] *See, e.g., 5-Star Mgmt., Inc. v. Rogers*, 940 F. Supp. 512, 522 (E.D.N.Y. 1996) (delivery of the note must generally accompany a mortgage and note assignment); *Nat'l Bank of N. Am. v. Flushing Nat. Bank*, 421

---

[12] *See, e.g., Slutsky v. Blooming Grove Inn, Inc.*, 542 N.Y.S.2d 721, 723 (2d Dep't 1989) ("The note secured by the mortgage is a negotiable instrument ...."); *U.S. Bank, N.A. v. Bennett*, No. 11 MA 40, 2012 WL 2254189, at *3 (Ohio Ct. App. 7th Dist. June 12, 2012) ("[A] note secured by a mortgage is widely considered to be a negotiable instrument.") (citation omitted); *Leyva v. Nat'l Default Servicing Corp.*, 255 P.3d 1275, 1279 (Nev. 2011) (footnote omitted) ("The proper method of transferring the right to payment under a mortgage note is governed by Article 3 of the Uniform Commercial Code—Negotiable Instruments, because a mortgage note is a negotiable instrument.").

[13] Even if UCC Article 3 were not to apply, New York trust law would still require both indorsement and delivery of the notes in strict compliance with the terms of the Pooling and Service Agreements (*see infra* at 23-24).

N.Y.S.2d 65, 66 (1st Dept. 1979) ("[w]ithout an indorsement, a transferee cannot be a holder"); *Provident Bank v. Cmty. Home Mortg. Corp.*, 498 F. Supp. 2d 558, 575 (E.D.N.Y. 2007) ("It is the indorsement on the instrument itself, not the right to indorsement, that vests the transferee with the status of holder.") (citing NY UCC 3-202)); *Wells Fargo Bank, N.A. v. Ford*, 418 N.J. Super. 592, 593 (N.J. Super. Ct. App. Div. 2011) (finding that plaintiff did not demonstrate it could enforce a note because the note was not indorsed properly).[14]  Under the law of some states, there must also be a separate document assigning the mortgage to the transferee for a transfer of a notes and mortgage to be complete – but this is in addition to the requirements of indorsement and delivery of the notes.  *See, e.g., McKenna v. Wells Fargo Bank, N.A.*, No. 11-1650, 2012 WL 3553475, at *5-6 (1st Cir. Aug. 16, 2012).  In addition, whether required for transfer or not, many states require that a document evidencing the assignment of the mortgage to the transferee be submitted in order for the transferee to be able to foreclose in the event of a default, as the transferee is not the original lender named on the initial mortgage documents – but this also is supplemental to the indorsement and delivery requirements.  *See, e.g., Leyva*, 255 P.3d at 1279.  Moreover, federal tax law provides that RMBS trusts will suffer enormous adverse tax consequences if they do not receive all their mortgages within three months of closing – with later cures generally forbidden.  *See* 26 U.S.C. § 860A *et seq.*; *see* Bradley T. Borden & David Reiss, *Wall Street Rules Applied to REMIC Classification*, Thompson Reuters News and Insight (Sept. 13, 2012), *available at*

---

[14] In *Western & Southern Life Insurance Co. v. Countrywide Financial Corp.*, No. 11-cv-07166-MRP, ECF No. 157, Slip op. at 9, this Court held that the ***delivery*** requirement was satisfied when the same Countrywide affiliate served as both depositor and servicer, as the servicer could be the Trustee's "custodian" and the depositor need not make a physical delivery to itself.  This Court did not there address the separate ***indorsement*** requirement, which requires that the notes be indorsed – either to the trustee or in blank – in addition to their being delivered.

http://newsandinsight.thomsonreuters.com/New_York/Insight/2012/09_-_September/Wall_Street_Rules_Applied_to_REMIC_Classification/.

### 2. The Offering Documents Affirmatively Represented that the Certificates Would be Mortgage-Backed Securities and that the Trusts Would Qualify as REMICS

The Offering Documents affirmatively represented that the Certificates would be mortgage-backed securities, actually backed by mortgage loans that the Trusts would own.  Thus, the Prospectus Supplements stated, for example:  "[t]he certificates represent interests in a pool consisting primarily of 30-year conventional fixed rate mortgage loans secured by first liens on one-to-four family residential properties."  (AMF ¶ 245) (quoting CWHL 2006-20 Pro. Supp. dated December 27, 2006 at S-1); the Offering Documents for each of the remaining Securitizations contained identical or substantially similar representations, *see* AMF Appendix A).  Indeed, each of the Offering Documents described the Certificates as "Mortgage Pass-Through Certificates" and repeatedly used the term "mortgage-backed" in describing the Certificates.  See, e.g. AMF ¶ 245 (quoting CWHL 2007-4 Pro. Supp. at 10).

The Offering Documents went on to describe a procedure for transfer of the loans to the Trusts that, if followed, would have complied with the legal requirements for an effective transfer.  Thus, the Offering Documents represented there would be an assignment of the mortgages to the Trustees at closing:

> At the time of issuance of the securities of a series, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee (or trust, in the case of a series with both notes and certificates), without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to the loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any Retained Interest specified in the related prospectus supplement.

AMF ¶ 246  (quoting CWHL 2007-4 Pro. Supp. at 54).

The Offering Documents further represented that there would be a delivery of indorsed notes to the Trust at closing:

> In connection with such transfer and assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee or its custodian, among other things, the original promissory note (the "MORTGAGE NOTE") (and any modification or amendment thereto) endorsed in blank without recourse, the original instrument creating a first lien on the related Mortgaged Property (the "MORTGAGE") with evidence of recording indicated thereon, an assignment in recordable form of the Mortgage, the title policy with respect to the related Mortgaged Property and, if applicable, all recorded intervening  assignments of the Mortgage and any riders or modifications to such Mortgage Note and Mortgage (except for any such document other than Mortgage Notes not available on the Closing Date, which will be delivered to the Trustee or its custodian as soon as the same is available to the Depositor) (collectively, the "MORTGAGE FILE")."

AMF ¶ 247 (quoting MLMI 2006-A4 Pro. Supp. dated July 26, 2006 at S-24 - S-25; the Offering Documents for each of the remaining Securitizations contained identical or substantially similar representation, see AMF Appendix A).

These requirements are essential to a valid transfer of the mortgage loan. Without them the transfer is *void*, not only under the UCC, but also under New York trust law, which governs the Trusts under the express terms of the PSAs.  As one court explained:

> Defendants' failure to strictly comply with the terms of the PSA means that the loan at issue was never properly transferred to the trust.  ***Any transfer of mortgage loans, such as Plaintiff's, was mandated to comply with New York Trust law and the terms and conditions of the PSA governing conveyance of mortgage loans into the trust.  This the Defendants did not do….Therefore, the purported, transfers, endorsements or assignments are void ab initio or never properly transferred into the Trust***.  The only Defendant with standing to proceed [with the foreclosure] is…the originator and original Lender of the Note and Mortgage.

*Hendricks v. U.S. Bank  N.A.*, No. 10-849-CH, slip op. at *6-7 (Mich. Trial Ct. Washtenaw Cnty. June 6, 2011) (emphasis added, internal citation omitted); *Horace v. LaSalle Bank, N.A.*,  No. 57-CV-2008-000362.00, slip op. (Cir. Ct. Russel Cnty. Ala. Mar. 25, 2011) (holding that neither a mortgage nor a note is

1    transferred to an RMBS trust if the method of transfer differs from the PSA's terms,

2    and permanently enjoining the trust from foreclosing).

3         A Congressional Oversight Panel, after receiving testimony and evidence

4    from many participants in the RMBS industry, further summarized the implications

5    for investors:

6              New York trust law requires strict compliance with the trust
              documents; any transaction by the trust that is in contravention
7              of the trust documents is void, meaning that the transfer cannot
              actually take place as a matter of law.  Therefore, *if the transfer*
8              *for [sic] the notes and mortgages did not comply with the*
              *PSA, the transfer would be void*, and the assets would not have
9              been transferred to the trust.

10                          *      *      *      *

11             Failure to transfer mortgages and notes properly to the trust can
              affect the holdings of the trust.  If transfers were not done
12             correctly in the first place and cannot be corrected, there is a
              profound implication for mortgage securitizations: it would
13             mean that the *improperly transferred loans are not trust assets*
              *and MBS are in fact not backed by some or all of the*
14             *mortgages that are supposed to be backing them.*

15   Congressional Oversight Panel, *November Oversight Report:  Examining the*

16   *Consequences of Mortgage Irregularities for Financial Stability and Foreclosure*

17   *Mitigation* 19, 26 (November 16, 2010) (emphasis added).

18        The Offering Documents represented that the Trusts would be Real Estate

19   Mortgage Investment Conduits ("REMICs"), entitled to pass-through tax status

20   under the Internal Revenue Code and thus not subject to double taxation (once at

21   the trust level and once at the investor level) – a tax benefit necessary for the

22   Certificates to make economic sense as investments.  Thus, each of the Offering

23   Documents described the Certificates as "Mortgage *Pass-Through* Certificates."

24   *See*, *e.g.* AMF ¶ 245 (quoting CWHL 2007-4 Pro. Supp. at 10) (emphasis added).

25   The Offering Documents further represented:

26             With respect to each Series of REMIC Certificates,
              Cadwalader, Wickersham & Taft LLP, counsel to the
27             Depositor, has advised the Depositor that in its opinion,
              assuming (i) the making of an appropriate election, (ii)
28             compliance with the Pooling and Servicing Agreement, and (iii)

compliance with any changes in the law, including any amendments to the Code or applicable Treasury regulations thereunder, each REMIC Pool will qualify as a REMIC."

AMF Appendix A  (quoting BOAMS 2005-F Pro. Supp. dated June 23, 2005 at p.77.; the Offering Documents for each of the remaining Securitizations contained identical or substantially similar representations, see AMF Appendix A).

### 3. The Complaint Alleges Sworn Court Documents Found by Plaintiffs that Confirm that the Mortgage Loans Were Not Transferred to the Trusts at Closing

The Complaint alleges that Plaintiffs have, through investigation, found many documents (some of which are annexed to the Complaint as Exhibits) that show that the mortgage loans were not effectively transferred to the Trusts as represented in the Offering Documents.  First, Plaintiffs found at least one mortgage note that was not indorsed to anyone – not to the Trustee, not to the Trust, not to any entity that might have been acting as the Trustee or the Trust's nominee, not in blank (AMF ¶ 254 & Ex. 3).  Second, Plaintiffs found numerous Satisfactions of Mortgage, acknowledging full payment of the loan and releasing the mortgage lien on the pledged real property, executed by parties other than the Trustees (AMF ¶ 250, Ex. 1 & Appendix B).  Finally, Plaintiffs found numerous Assignments of Mortgages – many expressly stating they represented the *first time the mortgage had been assigned* – that on their faces state that the mortgage was being assigned to the Trust *years after the Trust's closing* (AMF ¶¶ 251-253, Ex. 2 & Appendix B).  Taken as true, these Satisfactions and Assignments – all executed under oath – all assert that the Trusts did not own the loans at closing and for years thereafter.

### 4. Defendants' Attempts to Circumvent the Sworn Documents Found by Plaintiffs Are Unavailing

Defendants attempt to circumvent the sworn documents found by Plaintiffs, stating on their faces that mortgage loans had not been transferred to the Trusts at closing, in several ways.  None justifies dismissal of the Complaint.

1

2

**(a)   The Complaint Alleges Affirmative Representations That the Certificates Would Be Mortgage-Backed, Not Just Descriptions of the Provisions of the PSAs**

3    First, relying on this Court's June 29, 2012 decision in *Western & Southern*,

4 *supra*, Defendants argue that the representations in the Offering Documents were

5 merely accurate descriptions of what the PSAs provided, and not representations

6 that the actions required by the PSAs would actually occur (BA 18-20; CW 11-13).

7 Whatever may have been the case in *Western & Southern*, the Complaint here does

8 not merely allege representations concerning the loan transfer process set forth in

9 the PSAs, it also alleges direct representations in the Offering Documents that the

10 Certificates would be backed by mortgages.  AMF ¶ 245.  As for the Offering

11 Documents' representations concerning the mortgage loan transfer process, those

12 representations do more than merely represent the contents of the PSA – they also

13 represent that the described mortgage loan transfers would in fact occur.  It is clear

14 that an investor purchasing mortgage-backed securities would necessarily expect

15 that the securities would in fact be mortgage-backed – that the underlying mortgage

16 loans would be transferred to the Trusts in which the investor is investing.  It is

17 casuistry for Defendants to argue that their Offering Documents, which purported

18 to sell Plaintiffs mortgage-backed securities, did not make this basic representation

19 to them.[15]

20    Indeed, the ruling that the Offering Documents merely describe the mortgage

21 loan transfer provisions of the PSAs, but do not constitute affirmative

22 representations that the underlying mortgage loans would in fact be transferred to

23

24

25

26

27

28

---

[15] Defendants make the irrelevant point that some PSAs expressly represented that the Mortgage Electronic Registration System ("MERS") would be used to record mortgage assignments, noting that several of the assignment documents attached to the Complaint reference MERS (CW 16).  That is true – but what those assignment documents recited, under oath, was that MERS was effecting an assignment of the mortgage to the Trust years after the closing (and thus years after the times that both New York trust law and REMIC required the Trust to receive its assets).  At the very least, this raises an inference, which must be drawn in favor of Plaintiffs on this motion to dismiss, that the mortgages were not timely assigned to the Trusts, irrespective of MERS's involvement.

1   the Trusts, would mean that investors could *never* sue for the knowing sale of an

2   interest in an RMBS trust to which the issuers and underwriters knew mortgage

3   loans would not be transferred – an undesirable result.  *Cf. Western & Southern Life*

4   *Insurance Co. v. Residential Funding Company, LLC*, No. A1105042, slip op. at 15

5   (Ohio Ct. Common Pleas June 6, 2012) (permitting investor fraud claim for failure

6   to transfer).

7                    **(b)    The Trusts' Collections of Loan Payments and**
                             **Foreclosures on Defaulted Mortgages Do Not Prove**
8                            **that the Mortgage Loans Were Properly Transferred**

9              Defendants point out that the Trusts have collected interest and principal

10  payments, and have foreclosed on defaulted mortgages.  They argue that this shows

11  that the mortgage loans were, in fact, legally transferred to the Trusts.  CW 16.

12  That does not show any such thing.  The Trusts have so far been lucky that

13  borrowers, having been notified of a purported transfer of their mortgages to the

14  Trusts, have not realized that the transfers never actually occurred, and have made

15  their payments to the Trusts as directed.  The Trusts may not continue to be so

16  lucky as the federal Mortgage Task Force, headed by New York Attorney General

17  Eric Schneiderman, steps up its well-publicized activities in combating RMBS

18  fraud – including failure to effectively transfer mortgage loans to trusts.  *See* David

19  McLaughlin, *Bank Loan Bundling Investigated by Biden-Schneiderman:*

20  *Mortgages*, Bloomberg (May 4, 2012), *available at*

21  http://www.bloomberg.com/news/2012-05-04/bank-loan-bundling-investigated-by-

22  biden-schneiderman-mortgages.html.  Plaintiffs bought interests in Trusts that were

23  to have the unquestionable right to collect on mortgage loans – not Trusts that are

24  able to collect on loans only as long as the borrowers fail to realize that the Trusts

25  are not their legal creditors.

26             Similarly, while the Trusts may have been able to foreclose on some

27  delinquent mortgages, we do not yet know (a) whether there were other delinquent

28

mortgages on which the Trusts were *not* able to foreclose owing to their inability to establish ownership of the mortgage loans and (b) whether the cost of foreclosing, even where successful, was substantially inflated by defenses asserted by the borrower based on the Trust's difficulties in proving ownership of the mortgage loans.  It is no secret that RMBS trusts in general are having serious problems foreclosing on defaulted mortgages throughout the country because of difficulties in establishing ownership of the mortgage loans.[16]  Nor is it a secret that Countrywide RMBS trusts have been especially susceptible to this problem.

Thus, as alleged in the Complaint (AMF ¶ 260), an examination conducted by Fortune Magazine of foreclosure proceedings filed in Westchester and Bronx Counties in New York State between 2006 and 2010 analyzing 130 proceedings where BofA was foreclosing on a mortgage purportedly included in a Countrywide-issued RMBS trust found that:  (a) in the 104 cases where the loan being foreclosed on was originated by a Countrywide affiliate, ***not a single note*** was indorsed by the originator or the depositor, either in blank or to the trust (the notes contained only the borrower's signature); and (b) in the 26 cases where the loan being foreclosed on was originated by an entity unaffiliated with Countrywide, two-thirds of the notes were not indorsed by the originator or depositor, either in blank or to the trust (the notes contained only the borrower's signature).  *See* Abigail Field, *At Bank of America, More Incomplete Mortgage Docs Raise More Questions*, Fortune (June 3, 2011), available at http://finance.fortune.cnn.com/2011/06/03/at-bank-of-america-more-incomplete-mortgage-docs-and-more-questions/.  This analysis strongly indicates that there was a massive failure to have notes indorsed for transfer to the RMBS trusts, as required for a legally effective transfer of the notes, whether the loans were originated by Countrywide affiliates or by unaffiliated entities.

_____

[16] Appendix A to this Memorandum contains a list of cases from all over the United States where RMBS trustees were prevented from foreclosing on defaulted mortgage loans owing to their inability to establish ownership of the loan or the trust's right to foreclose on it.

Although prior to discovery we have not yet found any specific example in the loan pools underlying the Certificates of a lack of proper documentation of ownership of the mortgage loan leading to an inability to foreclose or a protraction of foreclosure proceedings, a strong inference can be drawn that such has in fact occurred, impairing the Trusts' cash flows – and that this problem will only get worse as public knowledge of mortgage loan transfer problems becomes more widespread.

### (c) The PSAs Did Not, and Could Not, Effect the Loan Transfers by Themselves

Defendants argue that there were no misrepresentations regarding the transfer of mortgage loans to the Trusts because the PSAs themselves effected such transfers. That contention is simply wrong as a matter of law. The loans could not have been transferred to the Trusts without the indorsement and delivery of the notes.

As explained above, the transfer of mortgage loans involves two components: (1) the indorsement and delivery of the notes that evidence the loan obligation, and (2) the assignment of the mortgage interest that secures the loan evidenced by the note. The transfer of the loan obligation is primary; without it, the assignment of the mortgage interest is meaningless, as the transferee holds no loan for which the mortgage would serve as security. *See, e.g., Carpenter v. Longan*, 83 U.S. 271, 274 (1872) (assignment of mortgage without transfer of loan a "nullity").

That is why, as set forth above, the PSAs explicitly provide for ***both*** the indorsement and delivery of mortgage notes to the Trusts ***and*** the assignment of mortgage interests to the Trusts.

Because the notes are negotiable instruments subject to UCC Article 3, they cannot be transferred by a mere contractual provision. A court in New York just recently rejected an RMBS trustee's argument that "the note was transferred to 'the trust', pursuant to a 'pooling and servicing' agreement," finding that "such agreement does not establish that [the depositor] assigned the note to [the trustee]."

*Deutsche Bank Nat'l Trust Co. v. Haque*, 36 Misc. 3d 1203(A), at *2 (N.Y. Sup. Ct. Queens Cnty. 2012) (quotations omitted).

In addition to the indorsement and delivery of the note, some states require that there ***also*** be a formal assignment of the mortgage interest. This is secondary to the indorsement and delivery. Thus, Defendants rely on *U.S. Bank N.A. v. Ibanez*, 941 N.E.2d 40, 53 (Mass. 2011), for the proposition that a general assignment provision in a PSA can effect an assignment of a mortgage to an RMBS trust. CW 15. However, the Massachusetts Supreme Judicial Court made clear in a subsequent decision that this assignment of the mortgage was ***additional*** to the indorsement and delivery of the note, which ***also*** must occur for the trust to have full rights to the mortgage loan. *McKenna*, 2012 WL 3553475, at *5-6.

Moreover, *Ibanez* placed strict requirements on a contractual provision purporting to effect a bulk assignment of mortgages to an RMBS trust. Such bulk contractual assignments are only effective if the PSA includes a detailed list of the assigned mortgages and the properties subject thereto. 941 N.E.2d at 54. Defendants have pointed to no such list in the PSAs here, but only to general provisions that do not identify *any* particular mortgages.

Defendants argue that the PSAs' requirement that the notes be indorsed and delivered to the Trusts somehow proves that the indorsement and delivery actually occurred (BA 21). Of course, the gravaman of Plaintiffs' claim is that the indorsement and delivery required by the PSAs did *not* occur. The fact that the requirement existed is no proof that it was complied with. As the United States District Court for the Eastern District of New York has explained, "It is the indorsement on the instrument itself, not the right to indorsement, that vests the transferee with the status of holder." *Provident Bank*, 498 F. Supp. 2d at 575.[17]

---

[17] BofA and Merrill Lynch argue in a footnote (BA 21, n.15) that the allegations of fraud based on the securities not being mortgage-backed fail to differentiate between the Defendants as required by Rule 9(b). The Complaint clearly alleges the distinct role played by each Defendant in the alleged fraud and more than

**(d)    The Complaint Does Not Allege Mere Failures to Perform Future Contractual Obligations**

Citing this Court's decision in *Western & Southern*, Defendants argue that Plaintiffs' allegations of failures to transfer loans constitute claims of failure to perform future contractual services, not claims of fraud.  The law is clear, however, that where, as here, a Plaintiff alleges a present intent to deceive them, and not a mere intention not to perform a contract with them, a claim will lie in fraud.  *See, e.g., MBIA*, 928 N.Y.S.2d at 233.  Here, Defendants had no contract *with the plaintiffs* to transfer the mortgage loans to the Trusts, and – unlike in *Western & Southern* – Plaintiffs have investigated RMBS securitizations structured, assembled, and sold by Defendants the year prior to most of those purchased by Plaintiffs, and have alleged that, through the interconnections within each Defendant group and their roles in the prior offerings, the members of each Defendant group knew (or were reckless in not knowing), at the time the Certificates were sold to Plaintiffs, that each group had made it a practice to fail to transfer mortgage loans to RMBS trusts at closing.  AMF ¶ 256.  Thus, Defendants knew at the time of the Offering Documents that loans would not be transferred to the Trusts, and their representations that the loans *would* be transferred were fraudulent.

As one court stated, rejecting Defendants' precise contention:

> The Certificates were marketed as mortgage backed and representations referred to present circumstances.  When construed in favor of Plaintiffs, the allegations support the inference that the statements were false when made.

---

adequately complies with Rule 9(b).  Tables 5-7 (not mentioned in BofA's and Merrill Lynch's motion) could not more precisely spell out the role of each Defendant.  These tables separately specify which Defendants acted as originator, depositor, sponsor and underwriter for each securitization.  In addition, the Complaint details the explicit roles of the Originator Defendants, the Sponsor Defendants, the Depositor Defendants and the Underwriter Defendants in defrauding Plaintiffs with respect to each securitization.  AMF ¶¶ 65-73.  Similarly, the role of each Controlling Parent Defendant and the parties named as successors-in-interest are also clearly laid out.  AMF ¶¶ 60-64; 277-316.

*Western & Southern Life Ins. Co. v. Residential Funding Co.*, No. A1105042, slip op. at 15.

### (e)    The PSAs' "Put-Back" Provision Is Not Plaintiffs' Sole Remedy

Defendants also argue, based on this Court's *Western & Southern* decision, that Plaintiffs' sole remedy for the failure to transfer loans to the Trusts is not a fraud claim, but rather an evocation by the Trustees of the several Trusts of the PSAs' "put-back" provision, permitting the Trustees to require the Depositors to "buy back" non-conforming loans.  CW 18.

The most obvious problem with this argument is that the "put-back" provision logically cannot apply to loans that are not non-conforming, but rather were never delivered to the Trusts.  If, as alleged, the Trusts never received the loans, it is impossible for their Trustees to put them back to the Depositors.

Moreover, Plaintiffs were not parties to the PSAs.  Their claims are not contract claims against the Depositors for failing to comply with the PSAs; they are fraud claims against the several Defendants for combining to defraud the Plaintiffs into believing the Certificates that Plaintiffs purchased were backed by mortgages when all Defendants well knew they would not be.

Finally, courts have roundly rejected the application of similar "cure" provisions to block fraud claims regarding widespread abandonment of underwriting criteria.  These courts recognize that such provisions are manifestly intended to cure occasional deviations from required criteria or procedures, and do not bar extra-contractual claims in cases of intentional, widespread, almost complete refusals to comply with represented requirements.  *See, e.g., Genesee County*, 825 F. Supp. 2d at 1190-92 (policy and provision of securities anti-fraud laws prevent contractual waivers of remedies); *NJ Carpenters Health Fund v. Residential Capital LLC*, 2011 WL 2020260, at *6 ("[T]he overwhelming majority of the courts in this Circuit have rejected the" rule that "cure" provisions for

occasional non-conforming loans bar claims of fundamental widespread fraud); *City of Ann Arbor*, 2010 WL 6617866, at *7 ("cure" provision  inapplicable where plaintiff alleges "widespread misrepresentations regarding the nature of the underwriting practices"); *Boilermakers Nat'l Annuity Trust*, 748 F. Supp. 2d at 1256 ("cure" provision inapplicable where plaintiff does not allege mere "representation about the absence of delinquent loans" but rather "misstatements and omissions regarding underwriting guidelines").

### III.   PLAINTIFFS PLEAD RELIANCE WITH SUFFICIENT PARTICULARITY

#### A.   The Complaint Adequately Pleads Actual Reliance

This Court has repeatedly held that allegations nearly identical to those made by Plaintiffs regarding their justifiable reliance on Defendants' misrepresentations should survive a motion to dismiss.  *Allstate,* 824 F. Supp. 2d at 1187-88 (allegations that plaintiff "received, reviewed, and relied upon the Offering Materials" and that "but for the misrepresentations and omissions" plaintiff would not have purchased RMBS, was a question of fact "better reserved for summary judgment or trial") (applying New York law); *Thrivent*, 2012 WL 1799028, at *5.

A misrepresentation is actionable when it induces a party to act, and the party was reasonable or justified in its reliance on the misrepresentation.  *Lama Holding Co. v. Smith Barney Inc.*, 646 N.Y.S.2d 76, 80 (1996) ("plaintiff must prove a misrepresentation or a material omission of fact . . . made for the purpose of inducing the other party to rely upon it, [and] justifiable reliance of the other party on the misrepresentation or material omission.").  New York law provides that as a general matter:

> [I]f the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.

*DDJ Mgt., LLC v. Rhone Group L.L.C.*, 905 N.Y.S.2d 118, 122 (2010) (quoting *Schumaker v. Mather*, 133 N.Y. 590, 596 (1892)). In cases, however, where "a plaintiff has taken reasonable steps to protect itself against deception, it should not be denied recovery merely because hindsight suggests that it might have been possible to detect the fraud when it occurred." *Id.*

Plaintiffs have established actual reliance, as the Complaint makes clear that but for the Defendants' misrepresentations regarding key loan quality statistics and the transfer of the mortgages and notes to the Trusts, Plaintiffs would not have purchased the Certificates. Plaintiffs specifically allege that had Defendants accurately disclosed that the Trusts were not in fact "mortgage-backed," and that the loan parameters, including LTV/CLTV ratios and owner-occupancy rates were not as represented, Plaintiffs would not have invested in the Securitizations. AMF ¶ 269. The Complaint further alleges that had Plaintiffs been aware of the lack of valid assignments of the mortgages to the Trusts, they would not have purchased the Certificates. AMF ¶ 268.

When deciding whether to invest in the Securitizations, AMF adhered to its rigorous investment processes and conducted due diligence based on the information available to it. For instance, AMF's investment criteria required that its RMBS investments have a minimum investment rating of "AA" using the lowest assigned rating[18] and certain LTV/CLTV ratios and owner-occupancy rates, or otherwise have mitigating factors. AMF ¶ 265. The Complaint alleges that Plaintiffs directly relied on the information in the Offering Materials that was misrepresented by Defendants when making the decision to invest in the Securitizations. Reliance was reasonable because importantly, Plaintiffs did not have access to the loan files to which the Defendants had sole access. The loan files contained "detailed information on each borrower, the borrower's credit

---

[18] Each of Plaintiffs' investment criteria required a "AA" rating except for Plaintiff AMF Ultra Short Fund, which required an "A" rating.

1  application and the property securing the loan.  This data was fundamental to

2  verifying the accuracy of the data presented by Defendants."  AMF ¶ 272.  The

3  Plaintiffs therefore could only reasonably rely on the materials provided by the

4  Defendants to conduct their due diligence, that is, the Offering Documents that

5  contained Defendants' misrepresentations.

6  **B.   Defendants' Various Arguments as to Reliance Fail**

7  In an attempt to circumvent direct precedent from this Court, Defendants

8  raise a number of arguments, none of which is availing to counter Plaintiffs' well-

9  pleaded reliance.

10  **1.   Defendants' "Disclosures" Do Not Defeat Reliance**

11  Countrywide asserts that "[i]n light of the numerous disclosures" contained

12  in the Offering Documents, "AMF cannot credibly claim that it reasonably relied on

13  isolated, alleged misstatements in the Offering Documents."  CW 28.  Such

14  arguments wholly ignore the allegations in the Complaint, which allege in detail

15  that Plaintiffs conducted due diligence in accordance with the investment processes

16  that AMF had in place when making RMBS investment decisions.  AMF ¶ 265,

17  269.  But no matter how sophisticated the Plaintiffs are, they could not have

18  uncovered the systematic and widespread misrepresentations contained in the

19  Offering Documents.  Risk factors and disclosures contained in offering materials

20  will not negate reliance where the party making the disclosures knew, at the time

21  they were made, such disclosures were false.

22  Generalized disclosures of amorphous risks will not shield defendants from

23  liability as the cautionary language must be "too prominent and specific to be

24  disregarded" and must "warn investors of exactly the risk that plaintiffs claim was

25  not disclosed."  *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211-12

26  (S.D.N.Y. 2004) (citation omitted).  Moreover, if a party is aware of a particular

27  problem worthy of disclosure, the party may not rely on general disclaimers to

28

avoid liability.  "[T]he inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts." *Id.* (quoting *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir.1994).

Countrywide cites to *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59 (1st Dept. 2012), in support of its argument that with respect to the loan quality misrepresentations, Plaintiffs' reliance was unjustified "when express statements regarding the credit characteristics of the borrowers and higher than average rates of delinquency were included in the very documents on which AMF purports to rely." CW 30.  *HSH Nordbank* was a litigation involving a CDO purchase, where the court found that HSH could not have reasonably relied on the information in the offering documents due to certain exculpatory warnings that are not even remotely present in this case.

Defendants' citation to *HSH Nordbank* is strange given the court's very clear differentiation between that case and a case such as the instant one where even sophisticated investors are forced to rely on the data provided by the issuer, and are reasonable in doing so.  Specifically, the court stated that,

> [i]n *MBIA Ins. Corp. v Countrywide Home Loans, Inc.* [928 N.Y.S.2d 229 (1st Dept. 2011)] we sustained the sufficiency of a fraud claim . . . [where] the matter allegedly misrepresented — whether the mortgage loans backing the securities that the plaintiff insured were made in compliance with applicable standards — was a matter peculiarly within the knowledge of the defendants, the entities that originated, serviced, and securitized the underlying loans and sold the resulting securities.

*HSH Nordbank AG*, at 941 N.Y.S.2d at 75, n.15.

Indeed, as alleged in the Complaint, the loan files that Defendants used to conduct their due diligence were exclusively in their possession and control, and Plaintiffs did not have the option of conducting an independent investigation prior to making an investment decision, aside from reviewing the overstated loan-quality parameters contained in the Offering Documents. AMF ¶¶ 20, 102, 272.  Because

1    of this key distinction, courts have found that investors in exactly the same situation

2    as Plaintiffs were reasonable in relying on the information provided by the issuer in

3    the offering documents.  *See Dodona I, LLC v. Goldman Sachs & Co.*, 847 F. Supp.

4    2d 624, 649 (S.D.N.Y. 2012) (finding reasonable reliance was sufficiently plead

5    where "even assuming that [plaintiff] is sophisticated, it is unclear to the Court

6    whether 'the information necessary to unmask the alleged fraud [would] have been

7    accessible to the sophisticated party through minimal diligence.'") (quoting *Terra*

8    *Sec. Asa Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441 (S.D.N.Y. 2010), *aff'd*

9    450 Fed. Appx. 32 (2d Cir. 2011)).

### 2.    The Complaint's Reliance Allegations Are Sufficiently Particular

12    Defendants further argue that Plaintiffs have not pleaded sufficient

13    particularity.  CW 28-29.  Again, Defendants' arguments fail based on the plain

14    allegations in the Complaint, which state that Plaintiffs' investment teams reviewed

15    the Offering Documents at the time of purchase in connection with the investment

16    processes that they were required to follow.  AMF ¶ 266.  The Complaint provides

17    detailed information with respect to each of the purchases at issue, including trade

18    dates.  AMF at Table 1.  In addition, Plaintiffs directly cite to the statements in the

19    Offering Documents on which they relied, including statements with respect to the

20    securities being mortgage-backed, the delivery of notes, as well as the

21    misrepresentations regarding loan quality characteristics.  Plaintiffs have pleaded

22    reliance with the particularity required by Rule 9(b).

### 3.    Plaintiffs Relied on All of the Offering Materials, Not Just the Prospectus Supplements

24    Defendants also argue that Plaintiffs cannot plead reliance where the

25    prospectus supplements were issued after the relevant "Trade Date," stating that

26    Plaintiffs made purchases "before the allegedly misleading prospectus supplements

1  were even issued." BA 31; CW29.  Defendants' argument distorts and ignores the

2  plain allegations in the Complaint and fails as a matter of law.

3      First, this argument is nonsensical, as Plaintiffs would not have invested in

4  securities about which they knew nothing.  Defendants fail to comprehend what is

5  included in the meaning of "Offering Documents" as defined in the Complaint to

6  include documents distributed to investors <u>before</u> the final Prospectus Supplement

7  was issued, such as registration statements, prospectuses, free writing prospectuses,

8  untitled collateral reports, and term sheets.[19]  AMF ¶ 2.  Specifically, the Complaint

9  alleges that the Prospectus Supplements which were "provided to investors,

10  including Plaintiff, included LTV or CLTV ratios that were similar, and often

11  identical, to the ratios included in the Term Sheets also provided to Plaintiff,"

12  which were provided to the Plaintiffs well before the Prospectus Supplements were

13  issued and were also relied on by Plaintiffs when deciding to invest in the

14  Securitizations.  AMF ¶ 90, n.4. In addition, many of the misrepresentations cited

15  by Plaintiffs were originally disseminated as part of the base prospectus for the

16  relevant securitizations and thus were available to Plaintiffs well in advance of any

17  initial trade date.  *See, e.g.*, ¶¶ 245 citing CWHL 2007-4 Pro. Supp. at 10 (base

18  prospectus dated Nov. 14, 2006), 246 citing CWHL 2007-4 Pro. Supp. at 54.

19      Second, Defendants' argument incorrectly assumes – without any citation

20  whatsoever – that the Trade Date is the point at which reliance occurred.  In fact,

21  the Trade Date is merely the date on which the order is placed, based on the

22  representations in the preliminary Offering Documents, but the actual purchase, and

23  ───────────────
    [19] The Court can properly consider these documents because they are (i)
24  incorporated by reference into the Complaint, and (ii) documents publicly filed with
    the SEC subject to judicial notice. *Dangler v. New York City Off Track Betting
25  Corp.*, 193 F.3d 130, 138 (2d Cir. 1999) (on a motion to dismiss, the court may
    consider "any documents attached to or incorporated by reference in the
26  complaint."); *In re DDAVP Indirect Purchaser Antitrust Litigation*, No. 05–CV–
    2237 (CS), 2012 WL 4932158, at *5 (S.D.N.Y. Oct. 17, 2012) ("When deciding a
27  motion to dismiss, the Court is entitled to consider . . . public disclosure documents
    required by law to be, and that have been, filed with the Securities and Exchange
28  Commission.")

therefore the point at which reliance attaches, does not happen until the Settlement Date which is always after the final Prospectus Supplement is published.  *See In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 77 n.33 (Bankr. S.D.N.Y. 1999) *aff'd*, 263 B.R. 406 (Bankr. S.D.N.Y. 2001) ("Claimants assert that a securities contract is formed on trade rather than settlement date. We disagree.")  For example, in *Abu Dabi Commercial Bank v. Morgan Stanley & Co.*, 08 Civ. 7508, ECF No. 474, Slip Op. at *51-73 (S.D.N.Y. Aug. 17, 2012), the court rejected the argument that investors in notes backed by RMBS could not rely on ratings that were generated after the trade dates, and denied defendants' motion for summary judgment because the defendants did not prove that the plaintiffs had entered into a binding agreement prior to receiving the finalized ratings.  *See id.* at 55 n.196, 58 n.208.  Similarly, here, for each of the Certificates Plaintiffs purchased, the Settlement Date was after the publication of the final Prospectus Supplement.  This is necessarily true because the certificates delivered on the Settlement Date did not exist prior to the Closing Date, which post-dates the final Prospectus Supplement in each instance.

It is axiomatic that "no contract can be created where a material element of the contemplated bargain has been left for future negotiations."  *Blakey v. McMurray*, 488 N.Y.S.2d 286, 287 (3d Dept. 1985).  The basic composition of the loan pool, which is reflected in the LTV, CLTV and owner-occupancy representations in the final Prospectus Supplements, is certainly a material element of the transactions.  It would be absurd to believe that investors commit to paying tens of millions of dollars as of the trade date, if the issuer could materially change the composition of the loan pool thereafter with the investor still bound to purchase a security that is now backed by an entirely different pool of loans than when the investor placed the initial order.  Rather, investors such as Plaintiffs rely on draft Prospectus Supplements and term sheets in deciding whether to place an order,

however, the actual agreement to purchase does not become binding on the parties, until the substance of the terms, *i.e.* the actual composition of the loan pool, are confirmed in the final Prospectus Supplement.  This is certainly true here, where Plaintiffs' investment criteria required that certificates being purchased obtain a certain credit rating.  Such credit ratings are, by definition, dependent on a final confirmation of the applicable LTV/CLTV ratios and owner-occupancy rates in the final Prospectus Supplement.  *See, e.g.*, CWHL 2007-4 Pro. Supp. at S-118 ("Moody's ratings take into consideration the credit quality of the related mortgage pool.")  Further, the credit ratings are a prerequisite for the issuance of the certificates.  *See, e.g.*, CWHL 2007-4 Pro. Supp. at S-118 ("It is a condition to the issuance of the senior certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement.")  Indeed, as the issuers make clear in their Term Sheets, there can be no trade prior to the final Prospectus Supplement.  *See, e.g.*, Final Term Sheet for BAFC 2007-A at , filed with the SEC on January 29, 2007, noting that:

> Because the asset-backed securities are subject to modification or revision, any such contract also is conditioned upon the understanding that no material change will occur with respect to the relevant class of securities prior to the closing date. If a material change does occur with respect to such class, our contract will terminate, by its terms, without any further obligation or liability between us.

Third, this precise argument was flatly rejected as "meritless" by Judge Cote in *Federal Housing Finance Agency v. Deutsche Bank AG*, 11 Civ. 6192 (DLC), ECF No. 140, slip op. at 7 (S.D.N.Y. Nov. 12, 2012), because "the data 'incorporated into the Prospectus Supplements' was the very same data included in the Preliminary Materials provided to the [investors].  The plaintiff's allegations

regarding the falsity of the Prospectus Supplements are therefore sufficient to plead the falsity of overlapping information in the Preliminary Materials as well."

### 4. Whether Reliance on the Offering Materials Years After Issuance Is Reasonable Is A Fact Issue That Cannot Be Resolved on a Motion to Dismiss

Finally BofA and Merrill Lynch make the perplexing argument that AMF could not have relied on the Offering Materials because it made five of its BofA Securitization purchases up to three years after the respective prospectus supplements were issued.  BA 31.  However, BofA never disclosed that anything in its Offering Materials was false.  Even as of early 2008[20] AMF may have been justified in believing that the financial crisis was driving real estate prices down, but there was nothing that should have alerted AMF that the securities at issue in this case were not mortgage-backed or that the characteristics of the loans supposedly backing the securities as represented in the Offering Materials were materially false.  Had the loans actually had the characteristics represented to Plaintiffs, they would have performed far better during the economic downturn than they did.  At most, Defendants' argument addresses whether AMF's reliance on the Offering Materials was reasonable, a quintessential fact question not for resolution by the Court on this motion to dismiss.  *Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*, 793 F. Supp. 2d 1138, 1145 (C.D. Cal. 2011) ("Whether Plaintiffs did or did not actually rely on Countrywide's misstatements… are all questions of fact that cannot be determined at [the] motion [to dismiss] stage.").

## IV.   THE COMPLAINT ADEQUATELY ALLEGES SCIENTER FOR THE LOAN QUALITY CLAIMS

This Court, as Defendants concede, has repeatedly declined to dismiss similar allegations to those contained in the Complaint regarding loan quality

---

[20] The trade dates for three of the securities at issue in this case are January 11, 2008, January 24, 2008 and February 4, 2008.  AMF ¶ 46, Table 1.

claims. *Dexia*, 2012 WL 1798997 at *5 (holding fraud allegations "are sufficient with respect to Plaintiffs' [claims of] systemic abandonment of underwriting standards, appraisals, LTV ratios, and ratings claims."); *see also*, *Allstate*, 824 F. Supp. 2d at 1186-87; *Thrivent*, 2012 WL 1799028 at *5.[21]

The Complaint fully sets forth and supports the particularized facts from which Defendants' knowledge of these misrepresentations is readily inferable. As discussed above (*see supra* Section II), Defendants conducted due diligence with respect to each one of these misrepresentations, and Defendants do not dispute that their own diligence vendor has testified to Congress that Defendants routinely "waived in" defective loans without disclosing the defects to investors. AMF ¶¶ 8, 105-116. The Clayton reports establish that the Defendants knowingly waived in nonconforming loans on a regular basis. Again, evidence of such a systematic violation of underwriting guidelines supports an inference of scienter, and the Complaint reveals the interrelatedness within the Countrywide, Bank of America, and Merrill Lynch Defendants, including shared high-level employees between the Originator Defendants and other defendants. *See, e.g., N. J. Carpenters Health Fund v. Residential Capital,* 2010 WL 1257528, at *6 ("Plaintiffs provide a credible inference that originators of these underlying loan pools systematically disregarded underwriting guidelines because of widespread evidence of this activity by the originator along with the fact that the loan pools provided by those same originators failed at considerable levels.") (internal quotations and citation omitted) (denying motion to dismiss fraud claims based on systematic disregard of underwriting standards)).

---

[21] In ruling that plaintiffs had adequately alleged scienter, *Allstate* specifically referenced plaintiffs statistics demonstrating overstated "owner-occupancy statistics." *Allstate*, 824 F. Supp. 2d at 1187. To the extent the Court's decision in *Mass. Mutual* conflicts with respect to owner-occupancy statistics, Plaintiffs, respectfully request the Court to follow its holding in *Allstate*.

1    The cases cited by Defendants for the argument that the Offering Documents

2    contained risk warnings and are therefore inconsistent with an intent to defraud,

3    CW 26, are readily distinguishable because those cases involved complaints in

4    which the plaintiffs did not conduct any significant loan-level investigation of the

5    specific securitizations those plaintiffs invested in.  *See Footbridge*, 2010 WL

6    3790810 at *10; *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692

7    F. Supp. 2d 387 (S.D.N.Y. 2010).  Where, as here, the Complaint demonstrates

8    through extensive investigations that the Offering Documents they relied on contain

9    specific misrepresentations, this Court and others have denied motions to dismiss

10   such allegations.  *See, e.g., Dexia*, 2012 WL 1798997, at *5; *MBIA v. Countrywide*,

11   928 N.Y.S.2d at 233; *FHFA v. UBS*, 858 F. Supp. 2d at 328.

12   In addition, the holding that such disclosures in offering materials negate any

13   intent to defraud have been widely rejected by courts.  *See, e.g., Plumbers Union*,

14   632 F.3d at 773 (disclosing that "exceptions occur when borrowers demonstrate

15   other 'compensating factors'" fails to "reveal [] what plaintiffs allege, namely, a

16   wholesale abandonment of underwriting standards"); *Genesee County*, 825

17   F. Supp. 2d at 1176 ("While these disclosures warned investors that the loan

18   originators would in some instances deviate from the stated underwriting

19   guidelines, they did not warn investors that the loan originators would

20   systematically abandon these guidelines"); *NJ Carpenters Vacation Fund v. Royal*

21   *Bank of Scotland*, 720 F. Supp. 2d at 270 ("Disclosures that described lenient, but

22   nonetheless existing guidelines about risky loan collateral, would not lead a

23   reasonable investor to conclude that the mortgage originators could entirely

24   disregard or ignore those loan guidelines"); *In re IndyMac Mortgage-Backed Sec.*

25   *Litig.*, 718 F. Supp. 2d 495, 509 (S.D.N.Y. 2010) (disclosing possibility of

26   exceptions does not defeat claim of misrepresentation when plaintiff alleges that

27   originator "ignored even those watered-down underwriting standards, including the

28

standards for granting exceptions to the guidelines, in order to originate as many loans as possible"); *Public Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 483 (S.D.N.Y. 2010) ("the alleged repeated deviation from established underwriting standards is enough to render misleading the assertion in the registration statements that underwriting guidelines were generally followed"); *Tsereteli*, 692 F. Supp. 2d at 392 ("the warnings . . . did not disclose these alleged facts" regarding abandonment of underwriting standards).

Defendants also argue that the Clayton reports are not necessarily tied to the Securitizations here. BA 23-24. Plaintiffs have, however, further investigated a sample of the actual loans in the Securitizations at issue, and set forth with particularity the percentages of loans in each of the Securitizations that contained misrepresentations regarding the loan metrics, which Defendants were aware of at the time the Certificates were issued to Plaintiffs. When combined with the Securitization-specific misrepresentations of loan level quality, Plaintiffs have established a strong inference that Defendants' widespread practice of waiving in non-conforming loans were the same as those covered in the Clayton report statistics.

## V. THE COMPLAINT ADEQUATELY PLEADS SCIENTER FOR THE MISREPRESENTATION THAT THE SECURITIES WERE MORTGAGE-BACKED

Defendants weakly argue that the Complaint fails to sufficiently allege scienter with respect to the allegations that the Offering Documents falsely represented that the securities were mortgage-backed. BA 29-30; CW 22-26. This argument is based on the same fundamental mischaracterization of Plaintiffs' allegations that permeates Defendants' discussion of this claim. Plaintiffs in fact have alleged that Defendants themselves failed to timely endorse and deliver notes and mortgages to the Trusts. As such, Defendants' knowledge that the mortgages were not transferred to the Trusts follows directly from their failure to transfer.

1    Also, Plaintiffs have investigated RMBS securitizations issued and

2    underwritten by Defendants prior to most of the Securitizations at issue in these

3    cases, and found that Defendants consistently failed to timely transfer notes and

4    mortgages to their trusts.  AMF ¶ 256.  This pattern of similar conduct forms a

5    common scheme and plan and leads to a strong inference of scienter.  *Patin v. State*

6    *Bd. for Professional Med. Conduct*, 911 N.Y.S.2d 184, 187-88 (3d Dept. 2010)

7    (pattern of conduct may establish scienter element of a fraud claim).

8    **VI.    THE COMPLAINT SUFFICIENTLY PLEADS LOSS CAUSATION**

9        Under New York law, causation is comprised of transaction ("but for")

10   causation and proximate causation.  *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (1st

11   Dep't 2002).  Plaintiffs easily satisfy transaction causation.  Plaintiffs would not

12   have purchased the Certificates if the Defendants had not made the alleged

13   misrepresentations in the Offering Documents.  AMF ¶ 269.  In addition, Plaintiffs'

14   injuries were also proximately caused by Defendants' fraud because the injuries

15   resulted from the misrepresentations alleged in the Complaint.  *See Silver Oak*

16   *Capital L.L.C. v. UBS AG*, 920 N.Y.S.2d 325, 327 (1st Dept. 2011) ("[P]laintiffs

17   sufficiently allege loss causation since it was foreseeable that they would sustain a

18   pecuniary loss as a result of relying on [Defendants'] alleged misrepresentations");

19   *MBIA v. Countrywide*, 928 N.Y.S.2d at 235 (motions to dismiss must be denied

20   where it is foreseeable that Plaintiff would suffer losses as a result of relying on

21   RMBS issuer's representations).

22       Plaintiffs purchased the Certificates at a price that failed to reflect the true

23   risks based on Defendants' misrepresentations in the Offering Documents.  Due to

24   the misrepresentations, the Certificates had a higher risk profile than what was

25   stated in the Offering Documents.  Plaintiffs' allegations that the understated risk

26   profile represented by Defendants caused Plaintiffs' investments to be sold at a loss

27   (AMF ¶ 45) are consistent with this Court's holding that such allegations are

28

1   "sufficient, at the pleading stage," to put Defendants on notice of the relevant losses

2   and the causal connection.  *Thrivent*, 2012 WL 1799028, at * 4.[22]

3       Issues relating to the credit crisis and mortgage and housing market

4   meltdown cannot be decided at the motion to dismiss stage and do not excuse

5   Defendants' fraud in this case.  *In re Countrywide Fin. Corp. Sec. Litig.*, 588

6   F. Supp. 2d 1132, 1174 (C.D. Cal. 2008) (It is "the fact-finder's job to determine

7   which losses were proximately caused by Countrywide's misrepresentations and

8   which are due to extrinsic or insufficiently linked forces."); *Dexia*, 2012 WL

9   1798997, at *6; *see also Dodona I*, 847 F. Supp. 2d at 649-50 ("the law does not

10  require plaintiffs to plead facts 'sufficient to exclude other non-fraud

11  explanations'") (citation omitted); *MBIA v. Countrywide*, 928 N.Y.S.2d at 235;

12  *ACA Fin. Guar. Corp. v. Goldman Sachs & Co.*, 35 Misc. 3d 1217 (A), at *17

13  (N.Y. Sup. Ct. New York Cnty. 2012) ("Nor can it be said, on this pre-answer

14  motion to dismiss, that [plaintiff's] losses were caused, as a matter of law, by the

15  2007 housing and credit crisis") (quotations and citation omitted).[23]

16  **VII.   THE COMPLAINT SUFFICIENTLY PLEADS INJURY**

17      Plaintiffs have suffered significant losses with respect to the Certificates they

18  purchased from Defendants as a result of Defendants' fraud.  Defendants'

19  misrepresentations about the Certificates being "mortgage-backed" and the quality

20  of the loan pools made the credit risk of the Certificates appear much lower than it

21  was in reality, which led to a decline in the Certificates' values once the credit risk

22

23

24  [22] Defendants citation to *Centaur*, 2011 WL 7939090 at *8 (CW 31) is inapposite.
    The Complaint pleads with particularity the relevant transaction dates, as well as
25  the basis for Plaintiffs losses, namely the misrepresentations contained in the
    Offering Documents.  *See* AMF Table 1.
26
    [23] Countrywide's Appendix A purportedly shows that delinquency rates are
27  inversely correlated to LTV/CLTV ratios.  Countrywide 33.  Such conclusions,
    which Plaintiffs dispute, are issues of fact more appropriately resolved after
28  Plaintiffs have had the opportunity to take discovery from Defendants.

materialized.  As a result, Plaintiffs sold the Certificates at a loss after they precipitously declined in value.

Defendants fail to explain why any of Plaintiffs' injuries are "hypothetical" because, as the Complaint alleges, Plaintiffs have already suffered substantial losses as a result of Defendants' misrepresentations.  *See* AMF ¶ 46, Table 1.  Indeed, the documents Defendants attach and cite show that the Trusts have already realized tens of millions of dollars in losses, see CW Exs. 16-27, which stem in part from the Trusts' difficulties in foreclosing on borrowers that have defaulted because the mortgages and notes were not properly transferred to the Trusts.[24]  Those losses are ultimately borne by the Certificate holders, including Plaintiffs.  Moreover, Plaintiffs paid $192 million for securities that were worth far less: they were not mortgage-backed as represented and for all of the reasons alleged in the Complaint, they were far riskier than represented.  This diminution in value is a sufficient allegation of damages.  *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 166 (2d Cir. 2012) (RMBS diminution in value due to enhanced credit risk resulting from misrepresented underlying loan characteristics is a cognizable loss); *New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 CIV 5653 (PAC), 2010 WL 1473288, *5 (S.D.N.Y. Mar. 29, 2010) (same).

---

[24] As noted above, Appendix A attached hereto is a sampling of cases from around the United States in which courts have denied foreclosure as a result of RMBS trustees' inability to establish ownership of the loans or legal entitlement to foreclose.  While the Complaint provided the overall takeaway that many courts are barring RMBS trusts from foreclosing on mortgages notes that they did not hold due to a failure to assign and transfer the Notes, Appendix A satisfies Countrywide's concern that Plaintiffs have not provided citations for the claim that "courts in at least 18 states have barred RMBS trusts from foreclosing on loans purportedly underlying the trusts due to improper or non-existent mortgage and/or note transfers."  AMF ¶ 263.

## VIII.  THE COMPLAINT STATES A CAUSE OF ACTION FOR AIDING AND ABETTING FRAUD

In addition to its own fraud, the Underwriter Defendants, Originator Defendants and Controlling Parent Defendants are liable for aiding and abetting the fraud of the Issuer Defendants.  "In order to plead properly a claim for aiding and abetting fraud, the complaint must allege '(1) the existence of an underlying fraud, (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud.'"  *Stanfield Offshore Leveraged Assets, LTD. v. Metropolitan Life Insurance Company*, 883 N.Y.S.2d 486, 489 (1st Dept. 2009) citing *UniCredito Italiano Spa v. JP Morgan Chase Bank*, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003).  As discussed *supra* at Section II, the existence of the underlying fraud by the Issuer Defendants is fully alleged in the Complaint.

Although actual knowledge of the fraud must be alleged, it may be alleged generally, in accordance with Rule 9(b).  *S.E.C. v. Berry*, 580 F. Supp. 2d 911, 923 (N.D. Cal. 2008) ("the plain text of Rule 9(b) requires only a general allegation of 'knowledge, and other conditions of a person's mind'").  Such allegations "must give rise to the strong inference of actual knowledge of the fraud."  *Flycell, Inc. v. Schlossberg LLC*, No. 11 civ. 0915 CM, 2011 WL 5130159, at *10 (S.D.N.Y. Oct. 28, 2011) (internal quotations and citation omitted) (holding plaintiffs adequately alleged aiding and abetting fraud).

The Complaint alleges that the Underwriter Defendants, Originator Defendants and Controlling Parent Defendants had actual knowledge of the Defendants' fraud.  *See, e.g.*, AMF ¶ 340-345.  This allegation is also well-supported by the fact that the Bank of America Defendants, Countrywide Defendants and Merrill Lynch Defendants shared officers, directors, executives and other high level employees.  AMF Tables 2, 3, 4.  Therefore, the knowledge of the other Defendants is attributable to the Underwriter Defendants, Originator

1  Defendants and Controlling Parent Defendants.  *See UBS Securities LLC v.*

2  *Highland Capital Management LP*, 924 N.Y.S.2d 312 (Sup. Ct. New York Cnty.

3  2011).

4         Substantial assistance exists where defendants "affirmatively assist[ed],

5  help[ed] conceal, or by virtue of failing to act when required to do so enable[d] the

6  [underlying harm] to proceed."  *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354

7  F. Supp. 2d 357, 378 (S.D.N.Y. 2005) (citations omitted).  Here, substantial

8  assistance is adequately pled with respect to each of the Underwriter Defendants,

9  Originator Defendants and Controlling Parent Defendants.  The Underwriter

10  Defendants played an essential role in the Issuer Defendants' fraud because they

11  solicited Plaintiffs' investments, delivered the Offering Documents containing the

12  misrepresentations, assisted in the preparation of the documents, and were required

13  to perform due diligence in connection with preparation of the Offering Documents.

14  AMF ¶¶ 70-73.  As a result, the Underwriter Defendants had full knowledge of the

15  misrepresentations and directly assisted in making the misrepresentations contained

16  in the Offering Documents.  Similarly, the Originator Defendants possessed direct

17  knowledge of the low quality of the loans which were included in the mortgage

18  pools of the Securitizations and the failure to transfer notes and mortgages to the

19  Trusts.  AMF ¶ 65.  As such, the Originator Defendants affirmatively aided the

20  Issuer Defendants fraud by originating the loans whose low quality was

21  misrepresented in the Offering Documents.  Finally, the Controlling Parent

22  Defendants directly or indirectly owned and controlled the other Countrywide,

23  Merrill Lynch and Bank of America Defendants and directed and profited from the

24  other Defendants' fraud. AMF  ¶¶ 60-64.

25         Plaintiffs recognize that this Court and others have held that a party may not

26  aid and abet oneself, *see, e.g. Dexia*, 2012 WL 1798997 at *7.  However, the

27  Complaint here is clear that the Underwriter Defendants, Originator Defendants and

28

Controlling Parent Defendants aided and abetted the fraud of the Issuer Defendants *in addition* to perpetrating their own fraud.  To that end, the Complaint delineates the specific role played by each group of Defendants which, as explained above, demonstrate not only their own direct fraud, but also the substantial assistance provided to the Issuer Defendants in making the misrepresentations in the Offering Documents with respect to the loan quality and the failure to transfer the mortgages and notes to the Trust.  AMF ¶¶ 60-65, 70-73.

## IX.    THE NEGLIGENT MISREPRESENTATION CLAIMS SHOULD NOT BE DISMISSED

Defendants contend that Plaintiffs' claims for negligent misrepresentation should be dismissed because the Complaint fails to allege the "special relationship" required that gives rise to a duty to disclose accurate facts (BA 32-33, CW 36-42).[25] Defendants are wrong.  The Complaint asserts that the Defendants had the kind of unique and special knowledge that was unavailable to Plaintiffs who, of necessity, had to rely on the accuracy of the information Defendants chose to disclose.  These are the circumstances that give rise to a duty to disclose and support Plaintiffs' claims for negligent misrepresentation.

In *Kimmell v. Schaefer*, 652 N.Y.S.2d 715 (1996), investors in a co-energy business suffered losses when a utility rate change doomed their investments.  The chief financial officer and chairman of the business solicited the investments and provided the investors with information that failed to account for the rate change.  The investors sued him for negligent misrepresentation and won a damages judgment.  The New York Court of Appeals affirmed and held that a duty to speak with care may be imposed in a commercial transaction "on those persons who

---

[25] This Court has dismissed negligent misrepresentation claims where complaints alleged mere "arms-length" commercial transactions and no additional facts sufficient to create a duty to disclose. *Dexia*, 2012 WL 1798997, at *7; *Allstate*, 824 F. Supp. 2d at 1192.  Unlike *Dexia* and *Allstate*, the complaint at issue here does allege the required additional facts that create a "special relationship" and the consequent duty to disclose.

possess unique or specialized expertise… such that reliance on the negligent misrepresentation is justified." *Id.* at 719.  The Court's rationale for imposing a duty of disclosure in these circumstances was that "in the commercial context, a duty to speak with care exists when 'the relationship of the parties … [is] such that in morals and in good conscience the one has the right to rely upon the other for information." *Id.* (citation omitted)  As one court summarized the rule, "[u]nder New York law, a duty to disclose material facts arises … where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge…."  *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 201 (S.D.N.Y. 2011).

The rule in *Kimmell* was applied recently in *King County Wash. v. IKB Deutsche Industriebank, AG*, 863 F. Supp. 2d 288, 306-307 (S.D.N.Y. 2012).  In denying a motion to dismiss a negligent misrepresentation claim asserted by institutional investors against rating agencies, Judge Sheindlin wrote:

> a 'sparsely pled' special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where 'the complaint emphatically alleges the other two factors enunciated in Kimmell [v. Schaefer].'  Plaintiffs have sufficiently alleged that the Rating Agencies possessed unique or specialized expertise, and that the Rating Agencies knew and intended that their ratings would be used by investors in deciding whether or not to invest in Rhinebridge.

*Accord*, *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508 (SAS), 2012 WL 4762039, *2-*3 (S.D.N.Y. Oct. 5, 2012) ("because Morgan Stanley allegedly had superior non-public information upon which it knew plaintiffs would rely, Morgan Stanley can be liable for negligent misrepresentation"); *Century Pac., Inc. v. Hilton Hotels Corp.*, No. 03 Civ. 8258 (SAS), 2004 WL 868211, *8 (S.D.N.Y. Apr. 21, 2004) ("Courts have found a special relationship and duty … where defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information."); *Silver Oak*,

920 N.Y.S.2d at 327 (finding that "[p]laintiffs sufficiently allege that [defendant] had unique and special knowledge . . . [sufficient] to state a cause of action for negligent misrepresentation as against [defendant]."); *CMMF, LLC v. J.P. Morgan Inv. Mgmt. Inc.*, 915 N.Y.S.2d 2, 6 (1st Dep't 2010) (allegations that defendants misrepresented the quality of the portfolio and the use of "misleading ratings" sufficient); *Empire One Telecomms., Inc. v. Verizon N.Y., Inc.*, 888 N.Y.S.2d 714, 731 (N.Y. Sup. New York Cnty. 2009) (allegations that plaintiff "necessarily relied" on defendants' statements sufficient).[26]

Here, Plaintiffs had no choice but to rely on the information provided by the Defendants because, as alleged in the Complaint, only the Defendants had access to the loan files that contained the detailed information about the thousands of loans supposedly backing the securities that the Defendants assembled into the Securitizations. Defendants utilized their unique knowledge of the loan details to package these loans into securities with specifically represented characteristics defining the risk of the securities that Defendants knew investors like AMF would rely on in making investment decisions. AMF ¶¶ 347-350. These circumstances justify Plaintiffs' reliance on the information provided by the Defendants and create the "special relationship" that supports a claim for negligent misrepresentation.

Defendants' simplistic arguments that arms-length commercial transactions do not give rise to a special relationship and that a duty to disclose does not arise from a disparity in the parties' knowledge (CW 40) thus miss the point. The duty to disclose arises from the justifiable reliance of Plaintiffs on the information provided by Defendants who had such information to provide because of their special knowledge. At the very least, whether the circumstances justified Plaintiffs

---

[26] Defendants concede that New York law is applicable to the negligent misrepresentation claim but make alternative arguments about Florida law. As discussed above in connection with the statute of limitations issue, Florida law is inapplicable under any circumstances.

in relying on the information Defendants provided is a fact question for the jury and not an issue for adjudication as a matter of law on this motion.  *See*, *Kimmell*, *supra*, at 264 ("Whether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact."); *King County*, 863 F. Supp. 2d at 307 ("a determination of whether a special relationship exists is highly fact-specific and 'generally not susceptible to resolution at the pleadings stage.' ") (citation omitted).

Defendants' motion to dismiss the negligent misrepresentation claims should be denied.

## X.   PLAINTIFFS HAVE ADEQUATELY PLED A *DE FACTO* MERGER UNDER DELAWARE LAW

Plaintiffs acknowledge this Court's rulings in *Maine State Retirement System v. Countrywide Financial Corp.*, No. 10-CV-0302 MRP (MANx), 2011 WL 1765509, at *8 (C.D. Cal. Apr. 20, 2011) ("Maine State II"), *Allstate*, 824 F. Supp. 2d at 1192-93, *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1230-1233 (C.D. Cal. 2012) and *Thrivent*, 2012 WL 1799028, at *8.

Plaintiffs respectfully submit that Delaware law on *de facto* mergers has further developed and been clarified by a Delaware court since this Court first gleaned its four factor test from "meager authority" in *Maine State II*.  In September 2011 the Superior Court of Delaware held that:

> The elements necessary to create a *de facto* merger under Delaware law are the following: (1) one corporation transfers all of its assets to another corporation; (2) payment is made in stock, issued by the transferee directly to the shareholders of the transferring corporation; and (3) in exchange for their stock in that corporation, the transferee agreeing to assume all the debts and liabilities of the transferor.

*Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*, No. S11C-04-013-ESB, 2011 WL 4826106, at *3 (Del Sup. Ct. Sussex Cnty. Sept. 19, 2011).

Plaintiffs have adequately alleged each of these three factors in their Complaint.  Regarding the first factor, Plaintiffs have alleged that "[s]ubstantially all of Countrywide Financial's and Countrywide Home Loans' assets were transferred to Bank of America on November 7, 2008."  AMF ¶ 297.  Regarding the second factor, Plaintiffs have alleged that "under the terms of the merger 'shareholders of Countrywide [] receive[d] .1822 of a share of Bank of America Corporation's stock in exchange for each share of Countrywide.'"  AMF ¶ 279.  Finally, Plaintiffs cite statements where employees of BofA acknowledged that as part of the transactions through which BofA acquired Countrywide, BofA assumed all the debts and liabilities of Countrywide.  AMF ¶ 285 ("'We bought the company and all of its assets and liabilities,' spokesman Scott Silvestri says.  'We are aware of the claims and potential claims against the company and have factored these into the purchase.'  *See* Amy Miller, *Countrywide in Crosshairs as Mortgage Crisis Fuels Litigation*, Corporate Counsel, Feb. 22, 2008.").

Based on the foregoing, Plaintiffs have adequately plead that a *de facto* merger between Bank of America and Countrywide occurred under Delaware law.  Accordingly, Bank of America Corp., Bank of America, N.A. and NB Holdings are the successors in liability to Countrywide and are jointly and severally liable for the wrongful conduct of the Countrywide Defendants.[27]

---

[27] Subsequent to Plaintiffs' filing the Complaint, on October 24, 2012 the United States Attorney for the Southern District of New York filed a complaint (*U.S. ex rel. O'Donnell v. Bank of America Corp.*, 12 Civ. 1422 (JSR)) against Bank of America Corp. and Bank of America N.A. as successor to Countrywide Financial Corp. and Countrywide Home Loans, Inc. to recover damages and penalties arising from a scheme to defraud Fannie Mae and Freddie Mac in connection with Countrywide's mortgage lending business.  The government's complaint asserts that Bank of America is liable as Countrywide's successor under the doctrines of de facto merger and assumption of liabilities and alleges facts beyond those alleged in the instant Complaint that Plaintiffs would be able to assert in an amended complaint if necessary.  For example, the government alleges in its complaint that "Bank of America has acknowledged in recent briefing, it was required by Fannie Mae guidelines to obtain Fannie Mae's consent to the Red Oak Merger '[t]o ensure [its]protection in a sale of a mortgage servicer that was servicing mortgage loans that Fannie Mae ...owned.' As a condition to its consent to the Red Oak Merger, Fannie Mae required that BANA guarantee the obligations of Countrywide Home

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that this Court deny the Defendants' motions to dismiss the Complaint and award such other and further relief as the Court deems appropriate.

November 14, 2012                         LABATON SUCHAROW LLP

                                          */s/ Joel H. Bernstein*
                                          Joel H. Bernstein
                                          jbernstein@labaton.com
                                          Martis Alex (Bar No. 77903)
                                          malex@labaton.com
                                          Mark S. Arisohn
                                          marisohn@labton.com
                                          140 Broadway
                                          New York, New York 10005
                                          Telephone: (212) 907-0700
                                          Facsimile: (212) 818-0477

                                          MOTLEY RICE LLP
                                          Mark I. Labaton (Bar No. 159555)
                                          mlabaton@motleyrice.com
                                          Robert Zabb (Bar No. 114405)
                                          rzabb@motleyrice.com
                                          1801 Century Park East, Suite 475
                                          Los Angeles, CA 90067
                                          Telephone: (310) 552-7992
                                          Facsimile: (310) 552-8054

                                          *Attorneys for Plaintiffs*
                                          *ASSET MANAGEMENT FUND, d/b/a*
                                          *AMF FUNDS, AMF INTERMEDIATE*
                                          *MORTGAGE FUND, AMF ULTRA*
                                          *SHORT FUND, AMF ULTRA SHORT*
                                          *MORTGAGE FUND, AMF SHORT*
                                          *U.S. GOVERNMENT FUND, and AMF*
                                          *U.S. GOVERNMENT MORTGAGE*
                                          *FUND*

---

Loans Servicing LP ("CHLS"), a Countrywide Home Loans subsidiary, to service loans that Fannie Mae had purchased." *U.S. ex rel. O'Donnell v. Bank of America Corp.*, 12 Civ. 1422 (JSR), Complaint at 36-37, (S.D.N.Y. Oct. 24, 2012). Allegations such as these provide further evidence that a de facto merger did in fact occur.